1   Mark D. Selwyn (SBN 244180)
    mark.selwyn@wilmerhale.com
2   WILMER CUTLER PICKERING HALE AND DORR LLP
    1117 California Avenue
3   Palo Alto, California 94304
    Telephone:    (650) 858-6000
4   Facsimile:    (650) 858-6100

5   James L. Quarles III (admitted *pro hac vice*)
    james.quarles@wilmerhale.com
6   James M. Dowd (admitted *pro hac vice*)
    james.dowd@wilmerhale.com
7   WILMER CUTLER PICKERING HALE AND DORR LLP
    1875 Pennsylvania Ave., N.W.
8   Washington, DC 20006
    Telephone:    (202) 663-6000
9   Facsimile:    (202) 663-6363

10  Attorneys for Defendants
    STMICROELECTRONICS, INC.
11  and STMICROELECTRONICS N.V.

12

13              UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF CALIFORNIA
14                   SAN JOSE DIVISION

15  | SanDisk Corporation, a Delaware | Case No.: C 04-4379 JF |
    | corporation, | Related Case C 05-5021 JF |
16  | | |
    | Plaintiffs, | |
17  | | |
    | v. | **ANSWER TO SECOND AMENDED** |
18  | | **COMPLAINT AND COUNTERCLAIMS** |
    | STMICROELECTRONICS, INC., a | |
19  | Delaware corporation, | |
    | STMICROELECTRONICS N.V., a Dutch | **DEMAND FOR JURY TRIAL** |
20  | company, | |
    | | |
21  | Defendants. | |

22

23

24          Pursuant to Rules 8, 12, and 13 of the Federal Rules of Civil Procedure and the Local Rules

25  of this Court, the defendants STMicroelectronics, Inc. and STMicroelectronics N.V. (collectively,

26  "ST") answer the allegations of SanDisk Corporation's ("SanDisk") Second Amended Complaint

27  and assert counterclaims as follows:

28

**PARTIES**

1.      On information and belief, ST admits that SanDisk is a Delaware corporation with its principal place of business in Sunnyvale, California.  ST admits so much of the second sentence of this paragraph as alleges that SanDisk has a substantial market share of flash data storage product sales and that SanDisk participates in the design, manufacturing and marketing of such data storage products, but denies that such data storage products utilize any valid claim of the asserted patents, and denies the remaining allegations in paragraph 1 of the Second Amended Complaint.

2.      ST admits the allegations of paragraph 2 of the Second Amended Complaint.

3.      ST admits so much of the allegations of paragraph 3 of the Second Amended Complaint as allege that STMicroelectronics N.V. is a holding company, and that STMicroelectronics N.V.'s subsidiaries design, manufacture, market, and sell semiconductors, including flash memory products.  ST denies any remaining allegations in paragraph 3 of the Second Amended Complaint.

**JURISDICTION AND VENUE**

4.      ST admits that SanDisk alleges an action arising under an Act of Congress relating to patents and that the Court has subject matter jurisdiction over this matter.

5.      ST admits so much of paragraph 5 of the Second Amended Complaint as alleges that the Court has personal jurisdiction over STMicroelectronics, Inc., but denies that the Court has personal jurisdiction over STMicroelectronics N.V.  Any remaining or inconsistent allegation is denied.

6.      ST denies that it has committed acts of patent infringement in this or any other district.

**FIRST CAUSE OF ACTION**

7.      ST repeats and restates its responses to the allegations of paragraphs 1 through 6 of the Second Amended Complaint in their entirety.

8.      ST admits that U.S. Patent No. 5,172,338 (the "'338 patent") is titled "Multi-State EEPROM Read and Write Circuits and Techniques;" that the '338 patent states that it was issued by the United States Patent and Trademark Office ("USPTO") on December 15, 1992; and that a copy

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

1    of the '338 patent is attached to the Second Amended Complaint as Exhibit B. ST denies the

2    remaining allegations of paragraph 8 of the Second Amended Complaint, and specifically denies

3    that SanDisk is the owner by valid assignment of the patent for the reasons set forth in the action

4    entitled *STMicroelectronics, Inc. v. SanDisk Corporation*, No. HG05237216, originally filed in the

5    Superior Court of Alameda County.

6      9.     ST denies the allegations of paragraph 9 of the Second Amended Complaint.

7      10.     ST denies the allegations of paragraph 10 of the Second Amended Complaint.

8      11.     ST denies the allegations of paragraph 11 of the Second Amended Complaint.

9      12.     ST denies the allegations of paragraph 12 of the Second Amended Complaint.

10                            **SECOND CAUSE OF ACTION**

11      13.     ST repeats and restates its responses to the allegations of paragraphs 1 through 12 of

12    the Second Amended Complaint in their entirety.

13      14.     ST admits that U.S. Patent No. 5,991,517 (the "'517 patent") is titled "Flash

14    EEPROM System With Cell by Cell Programming Verification;" that the '517 patent indicates that

15    it was issued by the USPTO on November 23, 1999; and that a copy of the '517 patent is attached to

16    the Second Amended Complaint as Exhibit C. ST denies the remaining allegations of paragraph 14

17    of the Second Amended Complaint, and specifically denies that SanDisk is the owner by valid

18    assignment of the patent for the reasons set forth in the action entitled *STMicroelectronics, Inc. v.*

19    *SanDisk Corporation*, No. HG05237216, originally filed in the Superior Court of Alameda County.

20      15.     ST denies the allegations of paragraph 15 of the Second Amended Complaint.

21      16.     ST denies the allegations of paragraph 16 of the Second Amended Complaint.

22      17.     ST denies the allegations of paragraph 17 of the Second Amended Complaint.

23      18.     ST denies the allegations of paragraph 18 of the Second Amended Complaint.

24                     **DEFENSES AND AFFIRMATIVE DEFENSES**

25                 **FIRST AFFIRMATIVE DEFENSE (Non-Infringement)**

26      19.     SanDisk is not entitled to any relief against ST because ST has not directly or

27    indirectly infringed the '338 patent or the '517 patent (collectively, "the SanDisk Patents").

28

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

1

### SECOND AFFIRMATIVE DEFENSE (Invalidity)

2     20.     One or more claims of the SanDisk Patents are invalid for failing to meet one or

3   more of the requisite statutory and decisional requirements and/or conditions for patentability under

4   Title 35 of the United States Code, including without limitation, §§ 102, 103, 112, and 116.

5

### THIRD AFFIRMATIVE DEFENSE (Unenforceability)

6     21.     The SanDisk Patents are unenforceable against ST because of patent misuse,

7   estoppel, collateral estoppel, laches, waiver, unclean hands, or other equitable doctrines.

8

### FOURTH AFFIRMATIVE DEFENSE (Unenforceability)

9     22.     The SanDisk Patents are unenforceable against ST because of inequitable conduct by

10   the '338 patent and '517 patent application participants before the USPTO, as set forth in detail

11   below in ST's counterclaims.

12

### FIFTH AFFIRMATIVE DEFENSE (Unenforceability)

13     23.     The '338 Patent is unenforceable against ST because the patent fails to name one of

14   the persons who is an inventor of the alleged invention claimed thereby.

15

### SIXTH AFFIRMATIVE DEFENSE (License)

16     24.     ST is exempt from liability for infringement in whole or in part because the alleged

17   inventions described in and allegedly covered by the SanDisk patents are used, manufactured, or

18   sold by ST, its suppliers, and/or its customers pursuant to a license.

19

### SEVENTH AFFIRMATIVE DEFENSE (Failure to Mark)

20     25.     SanDisk's right to seek damages is limited by its failure to mark its products or

21   otherwise give ST notice of the SanDisk Patents.

22

### COUNTERCLAIMS

23   STMicroelectronics, N.V. and STMicroelectronics, Inc. (collectively "ST") bring these

24   counterclaims against SanDisk Corporation ("SanDisk").

25

### PARTIES

26     26.     Counterclaim-plaintiff STMicroelectronics, Inc. is a Delaware corporation with its

27   principal place of business in Carrollton, Texas.  Counterclaim-plaintiff STMicroelectronics N.V. is

28

4

1  organized under the laws of the Netherlands with its principal place of business in Geneva,

2  Switzerland.  Unless otherwise noted, these parties are collectively referred to as "ST" below.

3          27.     Among other things, ST develops, manufactures and markets flash memory chips

4  and certain consumer products that incorporate flash memory chips.

5          28.     Counterclaim-defendant SanDisk is, according to the allegations of paragraph 1 of its

6  Second Amended Complaint, a Delaware corporation with its principal place of business in

7  Sunnyvale, California.  Among other things, SanDisk licenses technology to produce flash memory

8  chips, and, through various ventures with Toshiba Corporation, develops and manufactures flash

9  memory chips, and develops, manufactures, and markets consumer products that incorporate flash

10  memory chips.

11                              **JURISDICTION AND VENUE**

12          29.     This Court has subject matter jurisdiction of these counterclaims pursuant to 28

13  U.S.C. §§ 1331, 1337, 1338(a), 1367, and 2201.

14          30.     SanDisk is subject to personal jurisdiction in this District.

15          31.     Venue for these counterclaims is proper in this District pursuant to 28 U.S.C. §§

16  1391 and 1400(b).

17                                  **INTRODUCTION**

18          32.     Counts One through Five of these Counterclaims are actions for monetary damages

19  and injunctive relief under Section 2 of the Sherman Act and the laws of California.  Counts One

20  through Five arise from SanDisk's unlawful and anti-competitive campaign illegally to monopolize

21  or attempt to monopolize markets for flash memory chip technology, flash memory chips, and

22  consumer products that incorporate flash memory chips.  To monopolize or attempt to monopolize

23  these markets, SanDisk first unlawfully obtained patents on flash memory technology by

24  committing fraud on the United States Patent and Trademark Office (USPTO) and threatened and

25  attempted to enforce its fraudulently obtained patents.  SanDisk then commenced and pursued

26  serial, baseless litigation against ST and others to try to enforce its fraudulently obtained patents,

27  knowing full well that such litigation was subjectively and objectively baseless.  Having twice lost

28  actions commenced in the International Trade Commission, having had its appeal from the first

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

such loss summarily affirmed the day after oral argument, and having failed even to appeal to either the ITC or the Federal Circuit the second such loss, in which the Administrative Law Judge determined that SanDisk had wasted public and private resources by bringing the second ITC case and that the '517 patent was invalid, SanDisk continues to pursue its unfounded claims in this action. ST brings Counterclaims One through Five to seek compensation for its injuries caused by SanDisk's unlawful conduct and to restore competition in the affected markets.

33.     Counts Six through Eleven of these counterclaims are actions for declaratory relief and attorneys fees under 28 U.S.C. § 2201 and 35 U.S.C. § 285. Counts Five through Ten arise under Title 35 of the U.S. Code and decisional law relating to patent infringement, validity, and enforceability.

I.     **THE FLASH MEMORY INDUSTRY**

34.     Flash memory chips were introduced in the 1980s to meet demand for a high density, cost-effective memory product that could be erased electronically. Flash memory chips allow data to be stored in a durable, compact format that retains the data after power has been turned off. Flash memory chips are an essential component for a broad range of consumer electronic devices, including mobile phones, automobiles, memory cards, MP3 and multimedia players, and digital cameras.

35.     There are multiple levels of competition in the flash memory industry. First, there is competition to supply technologies necessary to permit the manufacturing of flash memory chips. Second, chip makers compete to sell flash memory chips to consumer product manufacturers. Third, consumer product manufacturers compete to sell consumer products that contain flash memory chips. Accordingly, there are several antitrust markets relevant to this action.

A.     **Flash Memory Chip Technology Market**

36.     The first relevant antitrust market is no broader than the "Flash Memory Chip Technology Market," the market for technology that is necessary to accurately measure and alter the state of a floating gate memory cell ("Flash Memory Chip Technology"). It is impossible to manufacture commercially viable flash memory chips without Flash Memory Chip Technology. Accordingly, manufacturers of flash memory chips do not view other technologies as substitutes for

1   Flash Memory Chip Technology, Flash Memory Chip Technology has demand and pricing that is

2   distinct from other technologies, and there are no substitutes to which manufacturers of flash

3   memory chips would switch in response to a small but significant and non-transitory increase in the

4   price ("SSNIP") for Flash Memory Chip Technology.

5       37.    SanDisk contends that the asserted patents cover technology, including what San

6   Disk describes as "permanent inhibit," that SanDisk has contended, and continues to contend is

7   necessary to accurately measure and alter the state of a floating gate memory cell and therefore is an

8   essential input to the manufacture of commercially viable flash memory chips.

9       38.    The geographic scope of the Flash Memory Chip Technology Market is worldwide,

10  or in the alternative, every country in which SanDisk contends it has patent rights over technology

11  that is an essential input to manufacturing flash memory chips.

12      39.    SanDisk's share of the world-wide Flash Memory Chip Technology Market is over

13  75%. SanDisk claims that over 75% of flash memory chips are being manufactured under a

14  SanDisk license for flash memory chip technology. SanDisk has a monopoly or, in the alternative,

15  a dangerous probability, of obtaining a monopoly in the Flash Memory Chip Technology Market.

16      40.    The Flash Memory Chip Technology Market is characterized by high barriers to

17  entry and expansion as a result of, among other things, SanDisk's purported ownership of

18  intellectual property covering technology necessary to manufacture flash memory chips; SanDisk's

19  unlawful assertion of fraudulently obtained intellectual property rights to control entry and

20  expansion within the Flash Memory Chip Technology Market ; and extremely high research and

21  development costs necessary to enter the Market.

22      **B.    Chip Market**

23      41.    A second relevant antitrust product market is no broader than the "Flash Memory

24  Chip Market," consisting of flash memory chips which are used as components for consumer

25  products. There are two types flash of memory chips: "NAND" and "NOR." The terms NAND and

26  NOR are derived from the logical architecture used for each type of chip. Manufacturers of

27  consumer products do not view other products as substitutes for flash memory chips, flash memory

28  chips have demand and pricing that is distinct from other products, and there are no substitutes to

1  which manufacturers of consumer products would switch in response to a SSNIP for flash memory
2  chips.

3      42.    Over 75% of all flash memory chips worldwide are either (a) manufactured by
4  various business ventures that SanDisk jointly controls with Toshiba Corporation to develop and
5  manufacture flash memory chips; or (b) manufactured under licenses to SanDisk's intellectual
6  property, through which SanDisk has received substantial royalties or licensing revenues. SanDisk
7  has the power to control prices in and restrict entry into the Flash Memory Chip Market. SanDisk
8  has a monopoly or a dangerous probability of obtaining a monopoly in the Flash Memory Chip
9  Market.

10     43.    Alternatively, a relevant antitrust product market consists of flash memory chips
11  with densities 4 Gb or greater (the "High-density Flash Memory Chip Market"). There are no
12  substitutes for high-density flash memory chips to which producers of consumer products would
13  switch in response to a SSNIP for high-density flash memory chips.

14     44.    Over 98% of all high-density flash memory chips worldwide are either (a)
15  manufactured by various ventures that SanDisk jointly controls with Toshiba Corporation to
16  develop and manufacture flash memory chips; or (b) manufactured under licenses to SanDisk's
17  intellectual property, through which SanDisk has received substantial royalties or licensing
18  revenues. SanDisk has the power to control prices in and restrict entry into the High-density Flash
19  Memory Chip Market SanDisk has a monopoly, or, in the alternative, a dangerous probability of
20  obtaining a monopoly, in the High-density Flash Memory Chip Market.

21     45.    The geographic scope of the market for either Flash Memory Chips or the High-
22  Density Flash Memory Chips is world-wide, or in the alternative, every country in which SanDisk
23  contends it has patent rights over technology that is an essential input to manufacturing flash
24  memory chips.

25     46.    Both the Flash Memory Chip Market and the alternative High-density Flash Memory
26  Chip Market (hereinafter referred to alternatively as the "Chip Market") are characterized by high
27  barriers to entry and expansion as a result of, among other things, SanDisk's purported ownership of
28  intellectual property covering technology necessary to manufacture flash memory chips; its

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

1  unlawful assertion of fraudulently obtained intellectual property rights to control entry and

2  expansion within the Chip Market; and extremely high costs necessary to enter the Chip Market.

3     **C. Markets for Consumer Products that Incorporate Flash Memory Chips**

4     47. Additional relevant antitrust markets are the "Flash Memory Chip Consumer Product

5  Markets," separate product markets for various consumer goods that incorporate flash memory

6  chips, such as memory cards, digital cameras and camcorders, mobile phones, digital audio players,

7  and gaming devices. For each of these Markets, buyers of the particular consumer product do not

8  view other products as substitutes for the consumer product, the consumer product has demand and

9  pricing that is distinct from other products, and there are no substitutes to which buyers of the

10  particular consumer product would switch in response to a SSNIP for the consumer product.

11     48. One Flash Memory Chip Consumer Product Market is no broader than the market for

12  mobile cards ("Mobile Card Market"). SanDisk Founder and Chief Executive Officer Eli Harari

13  has represented to Wall Street analysts that SanDisk accounts for 96% of U.S. retail sales of mobile

14  cards. SanDisk has a monopoly, or, in the alternative, a dangerous probability of obtaining a

15  monopoly in the Mobile Card Market.

16     49. SanDisk has an extremely high share in other Flash Memory Chip Consumer Product

17  Markets as well. For example, SanDisk claims that it is the world's largest supplier of flash data

18  storage card products. SanDisk has a monopoly, or, in the alternative, a dangerous probability of

19  obtaining a monopoly in Flash Memory Chip Consumer Product Markets in addition to the Mobile

20  Card Market.

21     50. The geographic scope of the Flash Memory Chip Consumer Product Markets is the

22  United States, or in the alternative, worldwide.

23     51. Flash Memory Chip Consumer Product Markets are characterized by high barriers to

24  entry and expansion.

25  **II. SANDISK'S ANTI-COMPETITIVE CONDUCT**

26     52. Through a continuing pattern of predatory conduct, SanDisk has obtained and

27  maintained or has a dangerous probability of obtaining, a monopoly in the Flash Memory Chip

28  Technology Market, the Chip Market, and Consumer Product Markets. As detailed below, SanDisk

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

1   has done so by (a) fraudulently obtaining patents from the USPTO and threatening and attempting

2   to enforce those patents, and (b) engaging in a series of subjectively and objectively baseless sham

3   legal actions. SanDisk's anticompetitive conduct has harmed competition in the relevant Markets

4   by, among other things, increasing prices and reducing competition, quality, innovation, and

5   consumer choice.

6       **A.     SanDisk's Fraudulent Acquisition of Patents from the USPTO**

7       53.     Over the past decade, SanDisk has fraudulently obtained patents from the USPTO,

8   including but not limited to U.S. Patent Number 5,172,338 (the "'338 patent") and U.S. Patent

9   Number 5,991,517 (the "'517 patent"). As detailed below, SanDisk deliberately failed to disclose

10  material information – including key prior art – at times when that key prior art was known to

11  SanDisk and SanDisk had a duty to disclose that art to the USPTO. Moreover, SanDisk made

12  representations to the USPTO that were material to the patentability of its then pending patent

13  claims that were not only false, but that SanDisk knew to be false. These material false

14  representations and omissions were intended to induce and did induce reliance by the patent

15  examiners charged with determining whether to grant SanDisk's patent claims. Indeed, as reflected

16  in the patent examiners' "reasons for allowance," the USPTO unquestionably relied on SanDisk's

17  material false statements and omissions as a principal reason for allowing SanDisk's patent claims

18  to issue. But for SanDisk's material false statements and omissions, the claims of the '338 patent

19  and the '517 patent could not have issued as written.

20      **B.     SanDisk's Original Prosecution of the '338 Patent**

21      54.     The '338 patent claims priority to an earlier filed U.S. application Serial No.

22  07/337,579 (the '579 application), entitled Multi-State EEPROM Read and Write Circuits and

23  Techniques, that was filed on April 13, 1989. On May 15, 1990, the USPTO issued an Office

24  Action in the application, which rejected all the claims as indefinite and "unduly multiplied." On

25  September 12, 1990, the inventors expressly abandoned the '579 application.

26      55.     On April 11, 1990, SanDisk filed U.S. Application Serial No. 508,273 (the "'338

27  application"). That application ultimately issued as the '338 patent and was entitled Multi-State

28  EEPROM Read and Write Circuits and Techniques.

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

56. The USPTO allowed the claims of the '338 application, as amended, on April 22, 1991. In the Notice of Allowability, the examiner provided the following reasons for allowance at pages 2-3:

> The following is an Examiner's Statement of Reasons for Allowance: the reference cells allocated for testing the program margin of the EEPROM cells are EEPROM cells themselves, with adjustable threshold voltages used for testing the memory cells of the array.... Further, some claims, for example claim 50, recited programming a chunk of data, verifying the chunk of data and means for inhibiting the programming and verification of cells that have already been verified, while enabling further programming in parallel all other addressed memory cells not yet verified.

57. The '338 patent was issued on December 15, 1992. The words "permanent inhibit" appear nowhere in any portion of the specification or the prosecution history of the '338 patent before December 15, 1992.

## C. Re-Examination Of The '338 Patent

58. On January 11, 1996, SanDisk filed a complaint with the United States International Trade Commission ("ITC") asserting that Samsung Corporation infringed claim 27 of the '338 patent as well as claims of another patent. On February 26, 1996, the ITC instituted an investigation based on SanDisk's complaint, U.S.I.T.C. Inv. No. 337-TA-382. In its defense, Samsung identified many prior art publications and devices that created a substantial challenge to the validity of claim 27 of the '338 claims. Late in the proceeding, Samsung identified as prior art to claim 27 of the '338 patent an article authored by Dr. Guido Torelli in an Italian publication, *Alta Frequenza*, and the product brochures and technical notes for a product called the M293 developed by SGS Thomson (ST's predecessor in interest).

59. As a result of this prior art, SanDisk and Samsung filed requests for re-examination of the '338 patent on September 15 and 17, 1996, respectively. They based the request on Dr. Torelli's article in *Alta Frequenza* and the product brochures and technical notes for certain SGS Thompson products, the M206, M293, and M490/491 integrated circuits. On October 11, 1996, the USPTO granted the re-examination request and indicated that the Torelli article and the product brochures and technical notes for the SGS Thompson products raised a substantial new question concerning patentability.

60.     On January 17, 1997, SanDisk submitted a "Patent Owner Statement including Proposed Amendments per 37 C.F.R. § 1.530(b)."  In this statement, SanDisk said there was a dispute over whether the '338 patent was patentable over (a) Dr. Torelli's *Alta Frequenza* article, (b) certain product brochures and technical notes for the SGS M206, M293, and M490/491 integrated circuits, and (c) the M293 integrated circuit as described in two test reports, a TAEUS Report dated August 9, 1996, and a Chipworks report dated October 19, 1996.  SanDisk said these materials were being presented "for consideration by the Examiner, as an admission pursuant to M.P.E.P. § 2258."

61.     In the reexamination, SanDisk argued in the Patent Owner Statement at pages 2-3 that claim 27 was patentable over Dr. Torelli's article and the SGS Thomson products because the "means for inhibiting" limitation of Claim 27 required that:

> addressed cells individually determined to have reached their desired programmed state are 'permanently' inhibited (i.e., 'terminated') from receiving additional programming pulse conditions for the duration of the program cycle, while address cells determined to have not reached their desired programmed states continue to receive programming pulse conditions until they too are individually determined to have reached their desired programmed states.  Consequently, after a cell had been correctly verified as having reached its desired programmed state, not even one additional programming pulse condition to the cell is allowed for the remainder of the program cycle. (emphasis supplied)

62.     To support this patentability argument, SanDisk argued that the '338 patent disclosed the structure to perform "permanent inhibit," that this structure was latch 721 shown in Figure 16, and that a person of ordinary skill in the art would know that latch 721 operates as a "one-way latch."  Referring to Figure 16, SanDisk further submitted arguments to USPTO that:

- "Figure 16 of the '338 Patent discloses a latch 721 which performs the function of inhibiting programming to correctly verified cells on a bit by bit basis.  (CFF 346-349).  That latch is a one way data latch that can only be reset after all of the cells in the programming cycle are correctly verified.  (CFF 346-349)." (Exhibit A of Patent Owner Statement at 25.)

- "The structures which additionally perform the function of 'inhibiting further programming of correctly verified cells until the plurality of addressed cells are verified correctly' include one-way latch 721, outputs 725 and 727 and AND gate 733." (*Id.* at 26);

- "In the Figure 16 embodiment, after latch 721 has been set to the verified state, the output of NOR gate 717 cannot reset the latch." (*Id.* at 57);

1      •  "In the Figure 16 embodiment, latch 721 is a one-way latch, and once that latch has been set or flipped, it can only be reset by the reset signal 727." (*Id.*);

2

3      •  "RESET signal 727 in Figure 16 of the '338 Patent would not be needed if latch 721 of Figure 16 was a two-way latch." (*Id.* at 58);

4      •  "The use of a RESET signal in combination with Latch 721 clearly indicates that the latch is a 'one-way' latch. Otherwise, RESET signal 721 would not serve any function." (*Id.* at 60);

5

6      •  "In light of the RESET signal, an individual of ordinary skill would recognize latch 721 to be a one-way latch." (*Id.* at 60 (emphasis added)); and

7

8      •  "It was unnecessary to provide a detailed description of the characteristics and sizes of the transistors comprising latch 721 in Figure 16 of the '338 Patent because an individual of ordinary skill would know how to size the transistors so that latch 721 operates as a one-way latch." (*Id.* at 58.)

9

10  63.  The USPTO relied on these and other SanDisk representations in deciding to confirm

11  the patentability of these claims. For example, in his reasons for confirming the patentability of

12  claim 27, the patent examiner stated that "the inhibiting feature recited in [the] claims of the '388

13  patent is enabled by latch 721 in Figure 16 which is a one-way resettable latch." ('338 Re-Exam,

14  Reexamination Reasons for Patentability / Confirmation dated April 16, 1997, at 3.)

15  64.  These representations were false when made. Latch 721 is a standard, two-way data

16  latch and the inventors of the '338 patent had published an article – not disclosed to the examiner –

17  that described an identically drawn latch as just that – a standard two-way data latch. (*See*

18  paragraphs 91 through 93, *infra*.)

19  **D.  Prosecution of the '517 Patent**

20  65.  The prosecution leading to the '517 patent was far more circuitous. It began when

21  SanDisk filed U.S. Application No. 07/337,566 (the "'566 application") on April 13, 1989. None of

22  the claims of the '566 application recited any form of "terminating" or "inhibiting" programming or

23  erasing of individual memory cells among a plurality of memory cells. Following many rejections

24  from the USPTO, SanDisk ultimately abandoned the '566 application. On March 18, 1993, the

25  USPTO issued a Notice of Abandonment of the '566 application citing SanDisk's failure to

26  prosecute this application.

27  66.  On October 20, 1992, SanDisk filed U.S. Patent Application no. 07/963,838 (the

28  "'838 application") as a divisional application from the '566 application. In prosecuting the '838

13

application, SanDisk immediately cancelled claims 1-55 from the '566 application and substituted new claims 56-62, each of which was directed to a "memory card." Following a rejection and amendments, the USPTO issued a Notice of Allowability as to application claims 56 and 58-60 on September 20, 1993. None of these '838 claims recited any form of "terminating" or "inhibiting" of programming or erasing of individual memory cells among a plurality of memory cells.

67.    On December 29, 1993, SanDisk filed U.S. Patent Application No. 08/174,768 (the "'768 application") as a continuation application from the '838 application. Following a number of rejections, amendments, and additions of new claims, the USPTO ultimately issued a Notice of Allowability on August 20, 1996, allowing application claims 79-99 and 116-144. Once again, none of these claims recited any form of "terminating" or "inhibiting" of programming or erasing of individual memory cells among a plurality of memory cells.

68.    On December 20, 1996, in the midst of its ITC litigation against Samsung Corporation, and the re-examination of the '338 patent, SanDisk filed U.S. Application No. 08/771,708 (the "'708 application") as a continuation of the '768 application. SanDisk filed the '708 application together with a Preliminary Amendment, which added 26 pages of text to the '768 specification, added 27 new figures, cancelled all of the original parent application claims, and added new claims 63-72.

69.    By December 1996, there had been no filing in the '338 line of patents since the application leading to the '338 patent itself was filed in April 1990. As a result, the '338 line of patents had been dormant for too long to allow SanDisk to seek a continuation in that line. Because SanDisk was not able to file any form of continuation application with the USPTO in the '338 family, it resorted to seeking claims based on the '338 patent in the '517 patent family in December 1996. In its remarks explaining the Preliminary Amendment to the '708 application, SanDisk said that the "primary purpose of the present amendment is to insert a majority of the incorporated Serial No. 07/337,579 [the parent application of the '338 patent] into the present application in order to support claims based thereon that are also being added by this Preliminary Amendment." (Preliminary Amendment at 29.) SanDisk further stated that the "claims being substituted into this application are directed to inhibiting, cell by cell, further application of voltages to a plurality of

1 cells when the individual cells are verified to have reached their desired states." (*Id.*) This was the

2 first mention of "cell by cell" inhibition anywhere in the chain of prosecutions leading to the '517

3 patent, and was done after the discovery of the Torrelli article.

4        70.     On December 23, 1997, SanDisk filed a Second Preliminary Amendment in the '708

5 application prosecution in which SanDisk amended the pending claims (including application claim

6 63 which became issued claim 1). In its "Remarks" at pages 9-10 of Second Preliminary

7 Amendment, SanDisk told the USPTO (emphasis supplied):

8          Each of the claims 63-99 now in this application are directed to
         programming a group of non-volatile memory cells by applying
9          programming conditions to the cells in the group, monitoring their
         programmed states, and then terminating application of the
10          programming conditions on a cell-by-cell basis as they reach their
         respective programmed states corresponding to data that is being
11          stored in the memory. The programming conditions remain applied
         until all cells of the group have been verified to be properly
12          programmed.

13          The claimed concept, namely inhibiting programming on a cell-by-
         cell basis until all the cells of an addressed group of cells have been
14          programmed, is also included in claim 27 of patent no. 5,172,338
         (hereinafter referenced as the "'338 patent"). This claim was asserted
15          by SanDisk Corporation, assignee of the '338 patent and the present
         application, against Samsung Corporation and its products in the
16          litigation identified in the Remarks to the first Preliminary
         Amendment filed with this application on December 20, 1996. The
17          status of the identified District Court and International Trade
         Commission ("ITC") actions is that they have now been settled. Prior
18          to the settlement, the ITC upheld the validity of the '338 patent claim
         27, and the USPTO decided, in Reexaminations instituted by both
19          SanDisk and Samsung, to confirm the patentability of claim 27.

20          The principal purpose of the present application is to define the cell-
         by-cell inhibition programming feature without all the other
21          limitations included in claim 27 of the '338 patent that are not
         necessary to its patentability. The feature of inhibiting programming
22          on a cell-by-cell basis until all cells in a group are programmed (also
         referenced as "termination") is <u>patentable by itself</u>.

23        71.     In this passage, SanDisk stated that it is specifically relying on the ITC and USPTO

24 reexamination proceedings to support the patentability of the then pending '708 application claims.

25 Indeed, together with the Second Preliminary Amendment, SanDisk filed the Notice of Intent to

26 Issue Reexamination Certificate, U.S. Patent No. 5,172,338, Reexamination Certificate No. B1

27 5,172,338, and the ITC Administrative Law Judge Initial Determination in Inv. No. 337-TA-382.

28

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

72.     On February 2, 1998, SanDisk filed a Third Preliminary Amendment.  SanDisk amended claim 63 for the second time.  At page 5 of this Third Preliminary Amendment, SanDisk explained that the reason for these amendments was to "further modify and improve the claims prior to their substantive examination."

73.     The USPTO issued an Office Action on March 31, 1998, rejecting claims 63-70, 71, 72, 74-85, 87-93, and 95-99 and objecting to claims 73, 82, 83, 86, and 94.

74.     SanDisk filed a Responsive Amendment on May 21, 1998, canceling claim 74, amending claims 83 and 98, adding claims 100-102, and amending the abstract.  As shown in the response, the applicants added the following text to the Abstract:

> Yet another improvement individually verifies the states of a plurality of cells that are being programmed in parallel in order to terminate the programming, as a result of the verification, on a cell-by-cell basis as the cells reach their programmed states.

At page 3 of the Responsive Amendment of May 21, 1998, SanDisk explained that the "Abstract of the Disclosure is being amended to add reference to another feature of the claims not previously included."  With respect to dependent claim 73, SanDisk argued that this claim "is supported by the specification description (pages 8-14 and Figures 2-4) of erasing two or more blocks of cells together; that is, changing the threshold levels of cells within two or more blocks to an erased state." And with respect to new claims 100-103, SanDisk explained that these claims "are patterned after claims 63-65 but are expressed in different terms."  (Responsive Amendment at 3.)  Explaining the "binary element" language of these claims, SanDisk said at page 3 (emphasis supplied):

> An example of the 'binary element' of these new claims is the latch 1721 of Figure 24.  Setting of this latch terminates any further alteration of the charge of its associated cell that might result from further application of the appropriate voltage conditions to others of the plurality of cells being programmed in parallel.

75.     On August 3, 1998, the USPTO issued a Notice of Allowability allowing claims 63-73 and 75-102.  The '708 application thereafter issued as the '517 patent.

**E.     SanDisk's Multiple Failures to Disclose Prior Art**

76.     At all times relevant to the re-examination of the '338 patent and the prosecution of the '517 patent, SanDisk and its agents had a duty to disclose to the USPTO all information known

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

1   to SanDisk that was material to the question of patentability. SanDisk also owed a duty of good

2   faith and candor, which encompassed a duty to disclose prior art. For each of these two patents,

3   SanDisk owed these duties from the time it made its application to the time the USPTO issued the

4   patent. For the '338 re-examination, SanDisk also owed these duties from the time it made its

5   request for re-examination to the time the USPTO issued its certificate of confirmation.

6       77.    As described below, persons substantially involved with the prosecution of the

7   SanDisk patents repeatedly failed to disclose prior art so material that the Administrative Law Judge

8   of the ITC held, in an opinion SanDisk did not appeal, that it invalidated all of the asserted claims of

9   the '517 patent. Had SanDisk disclosed this prior art, the claims of the '338 patent would not have

10  survived reexamination and the claim of the '517 patent would not have issued as written.

11      78.    A single law firm ("the SanDisk law firm") prosecuted both the '338 patent

12  application and reexamination, as well as the '517 patent application on behalf of SanDisk. Since at

13  least February 1996, that law firm maintained a database of prior art references to assist in the

14  preparation of SanDisk's patent applications. That database contained the following prior art.

15                      **1.    The Simko Patents**

16      79.    On December 26, 1989, and January 29, 1991, the USPTO issued U.S. Patent

17  Number 4,890,259 (the "'259 patent") and U.S. Patent Number 4,989,179 (the "'179 patent"),

18  respectively, to Richard Simko (collectively, the "Simko patents"). Both Simko patents disclose a

19  "permanent inhibit" programming system. SanDisk knew about the Simko patents no later than

20  January 5, 1993, when the SanDisk law firm disclosed those patents in a separate SanDisk patent

21  prosecution that ultimately resulted in the issuance of U.S. Patent No. 5,293,560. The SanDisk law

22  firm also disclosed the Simko patents on July 8, 1993, in a prosecution that resulted in the issuance

23  of U.S. Patent No. 5,422,842. Accordingly, SanDisk knew about the Simko Patents years before

24  the conclusion of SanDisk's '338 reexamination and '517 prosecution.

25      80.    In arguing to the USPTO that the claims of the '338 and '517 patents were directed

26  to "permanent inhibit," SanDisk was obligated to inform the USPTO of the existence of the prior art

27  Simko patents, which SanDisk concedes discloses "permanent inhibit." However, SanDisk never

28  disclosed the Simko patents to the USPTO during either the re-examination of the '338 patent or the

17

1   prosecution of the '517 patent, despite the fact that Dr. Simko was a litigation consultant to

2   SanDisk. SanDisk's failure to disclose the Simko patents was intended to deceive the patent

3   examiner into believing that SanDisk's claimed "inhibit" invention was novel. A reasonable patent

4   examiner would have been influenced by SanDisk's failure to disclose the Simko patents, and the

5   patent examiner did rely, as is reflected in the examiner's reasons for allowance. Had SanDisk

6   disclosed the Simko patents, the claims of the '338 patent would not have survived re-examination

7   and the claims of the '517 patent would not have issued as written.

8                            **2.    The JP-100 Patent**

9          81.    On February 13, 1986, Toshiro Koyama and Tsugio Tawara published the Japanese

10  Laid Open Patent Application JP S62-188100 (the "JP-100 patent"). Like the Simko patents, the

11  JP-100 patent discloses a "permanent inhibit" programming system. Persons substantially involved

12  in the prosecution of the '517 patent and the re-examination of the '338 patent knew of the JP-100

13  patent no later than December 30, 1998. Accordingly, SanDisk knew about the JP-100 patent well

14  before the conclusion of SanDisk's '517 prosecution.

15         82.    The JP-100 patent was material to the patentability of the then pending '517 patent

16  claims. This fact is confirmed by the decisions of two different patent examiners to whom the JP-

17  100 patent was revealed. SanDisk prosecuted a foreign counterpart to the '517 patent in Japan, with

18  a claim drafted in nearly identical language to claim 1 of the '517 patent. On October 23, 2001, the

19  Japanese Appeal Board rejected this claim as obvious over the JP-100 patent prior art.

20         83.    Similarly, in the prosecution of U.S. Patent Application File No. 09/129,675,

21  SanDisk initiated interference proceedings before the U.S. USPTO in which it asserted a claim

22  drafted to cover nearly identical subject matter as claim 1 of the '517 patent (the "Ohuchi

23  Interference"). On July 12, 2006, the USPTO rejected SanDisk's interference claims as obvious

24  over the JP-100 patent prior art. Thus, whenever a patent examiner considering the patentability of

25  claims like claim 1 of the '517 has become aware of the JP-100 patent, the claim under

26  consideration has been rejected.

27         84.    Because, *inter alia*, SanDisk was arguing to the USPTO that the claims of the '517

28  patent were directed to "permanent inhibit," SanDisk was obligated to inform the USPTO of the

                                        18                  ANSWER AND COUNTERCLAIMS
                                                            Case No. C 04-4379-JF; C 05-5021-JF

existence of the prior art JP-100 patent. However, SanDisk never disclosed the JP-100 patent to the USPTO at any time during the '517 prosecution. SanDisk's failure to disclose the JP-100 was intended to deceive the patent examiner into believing that SanDisk's claimed "inhibit" invention was novel.

85.     SanDisk succeeded in this deception effort. A reasonable patent examiner would have relied on SanDisk's failure to disclose the JP-100, and the patent examiner did rely as reflected by the examiner's allowance of claim 1. Had SanDisk disclosed the JP-100, the claims of the '517 patent would not have issued as written. Indeed, at the conclusion of U.S. International Trade Commission Investigation 337-TA-560, Administrative Law Judge Bullock determined that the JP-100 rendered claims of the '517 patent invalid as obvious. (*See* United States International Trade Commission Investigation No. 337-TA-560, Initial Determination ("560 ID"), at pages 123 through 134.)

### 3.     The Sparks Patent

86.     On June 28, 1979, the USPTO issued U.S. Patent Number 4,752,871 (the "Sparks Patent") to Robert Sparks, et al. The Sparks patent discloses bulk erasing and loading of multiple arrays simultaneously. SanDisk knew about the Sparks Patent no later than May 24, 1993, well before the conclusion of the '338 reexamination and the '517 prosecution. On May 24, 1993, the SanDisk law firm filed an amendment responding to the USPTO's rejection of another SanDisk patent application, 763,851 application (the "'851 application"), based on the prior art of the Sparks Patent. The SanDisk law firm continued to argue about the relationship between the '851 application and the Sparks Patent, including in a USPTO filing on April 5, 1996.

87.     Claim 64 of the '338 patent (which SanDisk added during the reexamination) and claim 11 of the '517 patent both claim bulk erasing and loading of multiple arrays simultaneously. Accordingly, SanDisk was obligated to inform the USPTO about the prior art of the Sparks Patent for the '338 reexamination and the '517 prosecution. SanDisk's failure to disclose the Sparks Patent was intended to deceive the patent examiner. A reasonable patent examiner would have relied, and the patent examiner did rely, on SanDisk's failure to disclosed the Sparks Patent. The

1   '338 patent and certificate of conformation and the '517 patent would not have been issued had

2   SanDisk disclosed the prior art.

3               **4.    The GB 145 Patent**

4        88.    On June 28, 1979, Hartmut Schrenk filed United Kingdom Patent application GB 2

5   029 145 A ("GB 145 Patent"). That patent disclosed inhibiting the individual erasing of any

6   addressed cell verified to have reached its intended erase state while enabling further erasing in

7   parallel to other addressed cells not verified. The patent was published on June 16, 1982. Persons

8   substantively involved in the prosecution of the '338 re-examination and the application that lead to

9   the '517 patent, SanDisk knew of the GB 145 Patent no later than February 23, 1996. The SanDisk

10  law firm filed an Information Disclosure Statement citing the GB 145 Patent on December 30,

11  1998, in SanDisk's Patent Application No. 09/129,675. Accordingly, SanDisk knew about the GB

12  145 Patent well before the conclusion of the '338 reexamination and the '517 prosecution.

13       89.    At least claim 40 of the '338 patent and claims 1, 2, 4, 6, and 10 of the '517 patent

14  claim the same innovations that the GB 145 Patent disclosed. SanDisk was therefore obligated to

15  disclose the GB 145 Patent in the '338 reexamination and '517 prosecution, and, insofar as it knew

16  about the GB 145 Patent at the time, in the '338 prosecution as well. The GB 145 Patent is

17  unquestionably material to SanDisk's patent claims, because the Administrative Law Judge of the

18  United States International Trade Commission has held that the GB 145 anticipates '517 patent

19  claims 1, 6, and 10, rendering the patent invalid. (*See* 560 ID at 115-117.)

20       90.    SanDisk's failure to disclose the GB 145 was intended to deceive the USPTO. A

21  reasonable patent examiner would have relied, and the patent examiner did rely, on SanDisk's

22  failure to disclosed the GB 145 Patent, and the '338 patent and certificate of confirmation. The

23  '517 patent would not have been issued had SanDisk disclosed the prior art.

24       **F.    SanDisk's Knowing Misrepresentations.**

25               **1.    The Inventor's VLSI Paper**

26       91.    As described above in paragraphs 62 through 64, throughout the '338 re-

27  examination, SanDisk repeatedly and knowingly misrepresented Figure 16 of the '338 patent as

28  disclosing a "one-way latch" when, in fact, it discloses only a standard two-way data latch.

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

92.     In 1992, a named inventor of the '338 and '517 patents, presented a paper co-authored by another named inventor of the '338 and '517 patents to the VLSI (Very Large Scale Integration) Symposium in Seattle, Washington. Figure 5 of the VLSI Symposium paper is identical to Figure 16 of the '338 patent, but describes that the latch (including its reset latch) as a standard data latch, not a "one-way latch."

93.     Despite its obligation to do so, SanDisk never disclosed as prior art the VLSI paper during the reexamination of the '338 patent. Instead, SanDisk repeatedly, falsely represented to the examiner and others that Figure 16 was a "one-way latch." SanDisk knew those representations were false when it made them and made the representations and failed to disclose the prior art of the VLSI paper with an intent to deceive. A reasonable patent examiner would have relied, and the patent examiner did rely, on SanDisk's misrepresentations and failure to disclose the VLSI paper in granting a certificate of confirmation for the '338 patent. The certificate of confirmation would not have been issued had SanDisk not made misrepresentations and failed to disclose the prior art.

### 2.     Arguments For Patentability in the '517 Prosecution

94.     In 1996, SanDisk filed the application that led to the '517 patent for the specific purpose of broadening SanDisk's rights and jettisoning the means-plus-function limitations of the '338 patent (emphasis supplied):

> The principal purpose of the present application is to define the cell-by-cell inhibition programming feature without all the other limitations included in claim 27 of the '338 patent that are not necessary to its patentability. The feature of inhibiting programming on a cell-by-cell basis until all cells in a group are programmed (also referenced as 'termination') is patentable by itself.

('517 File History, Second Preliminary Amendment filed December 23, 1997 at 9-10, emphasis supplied.) SanDisk could not have made this statement if the Simko patents – which SanDisk has conceded to the ITC discloses permanent inhibit – had been disclosed to the USPTO.

95.     SanDisk also never cited two additional permanent-inhibit references – the GB 145 and the JP 100 – about which it was aware. Disclosure of those references would have prevented SanDisk from representing that permanent inhibit is patentable by itself. As discussed above, *see* paragraph 89, an Administrative Law Judge of the United States International Trade Commission has found that the GB 145 prior art reference anticipates claims 1, 6, and 10 of the '517 patent.

21

1    Similarly, the Administrative Law Judge has also found that the JP 100 prior art reference standing

2    alone, or in combination with other references, renders obvious claims 1, 3, 5-8, 10, 12, 13, and 14

3    of the '517 patent. SanDisk could not have claimed, as it did in the application for the '517 patent,

4    that permanent inhibit was "patentable by itself" had it disclosed either the GB 145 or the JP 100 to

5    the examiner.

6          96.    SanDisk and its prosecuting attorney unquestionably knew of the JP 100 and the GB

7    145 at the time they were prosecuting the '517 application. In a filing in the Ohuchi Interference on

8    December 3, 1998, for example, SanDisk's prosecuting attorney told the USPTO that he had

9    reviewed the Ohuchi patent file history. That file history is replete with substantive discussions of

10   the JP 100 and GB 145 prior art – and the fact that they disclose permanent inhibit. Thus, by

11   arguing to the USPTO in the '517 prosecution that permanent inhibit was patentable by itself,

12   SanDisk intentionally mislead the USPTO as to the patentability of the '517 patent's claims.

13         **G.     SanDisk's Sham Legal Actions**

14         97.    Having successfully acquired the '338 and '517 patents by defrauding the USPTO,

15   SanDisk has attempted to enforce the patents against ST and other competitors through sham legal

16   actions to monopolize or attempt to monopolize the relevant Markets. SanDisk knew when it filed

17   its legal actions that its '338 and '517 patents had been obtained by defrauding the USPTO. As

18   SanDisk also knew, its legal actions were subjectively and objectively baseless when filed; that is,

19   no reasonable litigant could have realistically expected success on the merits absent fraud on the

20   tribunal. SanDisk has abused government process as an anticompetitive weapon with the specific

21   intent to obtain and maintain monopoly positions without regard to the outcome of the legal actions.

22         **1.     The 526 Investigation**

23         98.    On October 15, 2004, SanDisk filed a complaint before the International Trade

24   Commission (ITC) alleging that certain of ST's NAND Flash memory chips infringed claims 27, 32

25   and 38 of SanDisk's '338 patent in violation of Section 337 of the Tariff Act of 1930, as amended,

26   19 U.S.C. § 1337. Section 337 prohibits importation of products that infringe a patent that is being

27   practiced in the United States. SanDisk sought an order excluding ST's products from importation

28   into the United States. Based on SanDisk's knowing misrepresentations that its '338 patent was

1   valid, enforceable, and infringed, the ITC launched Investigation No. 337-TA-526 (the "526

2   Investigation").

3       99.     Simultaneously, SanDisk filed a complaint for patent infringement in the U.S.

4   District Court for the Northern District of California seeking damages and an injunction. This

5   Court stayed that action pending the outcome of the ITC proceeding.

6       100.    SanDisk's complaint against ST was so strained that SanDisk relied on the doctrine

7   of equivalents for every means plus function element of the claims. On October 19, 2005, the

8   Administrative Law Judge (ALJ) ruled for ST. The ALJ found that (a) SanDisk's NAND Flash

9   products did not practice the '338 patent and (b) ST's products did not infringe the '338 patent. On

10  December 5, 2005, the ITC adopted the ALJ's findings in its final decision.

11      101.    SanDisk appealed. SanDisk's appeal was heard on March 4, 2007. The next

12  morning the United States Court of Appeals for the Federal Circuit affirmed the ITC's

13  determination pursuant to Rule 36.

14                  **2.    The 560 Investigation**

15      102.    As described, *supra* at paragraph 100, on December 5, 2005 the ITC adopted the

16  Administrative Law Judge's opinion of no infringement. On December 6, 2005, the very next day,

17  SanDisk filed a complaint in the U.S. District Court for the Northern District of California alleging

18  that certain of ST's NAND and NOR flash memory chips infringed SanDisk's '517 patent.

19      103.    A month later, on January 10, 2006, SanDisk filed ITC complaint 337-TA-560

20  alleging that certain of ST's NAND and NOR flash memory chips infringed SanDisk's '338 and

21  '517 patents and were being imported into the United States in violation of Section 337. On

22  February 8, 2006, the ITC instituted ITC Investigation No. 337-TA-560 (the "560 Investigation")

23  based on SanDisk's knowing misrepresentations in its complaint that the '338 and '517 patents

24  were valid, enforceable, and infringed. The patent infringement action in this Court was stayed

25  pending the outcome of the ITC investigation.

26      104.    SanDisk's complaint was subjectively and objectively baseless for at least four

27  reasons:

28

23

1       105.    SanDisk knew that the '338 and '517 patents were invalid and unenforceable

2 because of SanDisk's inequitable conduct in connection with the prosecution and reissuance of the

3 patents as described in paragraphs 53 to 96.

4       106.    SanDisk falsely alleged that ST's NOR Single-Level Cell (SLC) products infringed

5 SanDisk's patents by using the so-called "permanent inhibit" technology. This allegation was

6 demonstrably false and could not have been made had SanDisk performed any investigation into the

7 facts. Indeed, ST engineer Mauro Sali testified in a deposition on August 3, 2006, that ST's NOR

8 SLC products do not practice "permanent inhibit" technology. Despite hearing Mr. Sali's

9 testimony, SanDisk nevertheless filed later that same day a motion for leave to file an amended

10 complaint in which it continued to allege that ST's NOR SLC products infringed the '337 and '517

11 patents. Before SanDisk finally admitted that ST's NOR SLC products do not infringe SanDisk's

12 patents, SanDisk unnecessarily harassed numerous ST customers with discovery requests and

13 increased ST's litigation costs.

14       107.    SanDisk continued to pursue its subjectively and objectively baseless ITC complaint,

15 including taking discovery from ST's customers in an effort to dissuade them from continuing to

16 buy ST flash memory chips.

17       108.    To try to meet Section 337's domestic industry requirement -- which requires that

18 some party be practicing the patent at issue in the United States -- SanDisk falsely alleged that Intel

19 Corporation was practicing the '338 patent in the United States. When it filed the 560 Complaint,

20 SanDisk knew or recklessly disregarded the fact that Intel was not practicing the '338 patent. Intel

21 has since represented that it does not practice the '338 patent.

22       109.    On June 1, 2007, an Administrative Law Judge issued his Initial Determination in

23 ITC Investigation No. 337-TA-560. The Administrative Law Judge found that not only had

24 SanDisk "failed to meet its burden of proof for the economic prong of domestic industry for the

25 '338 patent," the "evidence cited by SanDisk [was] unreliable and unpersuasive." (560 ID at 44-

26 45.)

27       110.    The Administrative Law Judge censured SanDisk for basing its domestic industry

28 allegations – a jurisdictional requirement in ITC investigations – on products of a third-party, Intel

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

1  Corporation, but not bothering to determine in advance of filing its complaint whether or not Intel's

2  products in fact practiced the '338 patent. It said:

> Perhaps if SanDisk would have approached Intel before the
> Complaint was filed, SanDisk would have had the requisite
> information needed to prove its case, or SanDisk could have
> determined that Intel did not have a domestic industry in the '338
> patent and not have asserted the '338 patent in this investigation.
> Instead, SanDisk, acting in haste, subjected ST to months of
> relitigating the '338 patent, wasting both public and private resources.
> Therefore, no other judicial resources will be consumed in addressing
> this patent.

8  (560 ID at 45-46 (emphasis supplied).)

9      111.    SanDisk did not seek review by the Commission of the Administrative Law Judge's

10  finding.

11          **3.    Case No. 04-4379 JF**

12      112.    Despite the ITC's determinations, and without seeking review by the Commission or

13  the Court of Appeals for the Federal Circuit on August 2, 2007, SanDisk filed its Second Amended

14  Complaint in this Court, asserting once again that ST's products infringe the '338 and '517 patents.

15      113.    SanDisk's allegations in its Second Amended Complaint are subjectively and

16  objectively baseless, particularly in light of the ITC's prior rulings.

17  **III.    SANDISK'S PREDATORY CONDUCT HAS INJURED ST AND COMPETITION**

18      114.    SanDisk's unlawful and anti-competitive conduct has enabled SanDisk to acquire,

19  enhance, and maintain monopoly power, or, in the alternative, created a dangerous probability of

20  SanDisk obtaining monopoly power, in the Flash Memory Chip Technology Market, the Chip

21  Market, and Flash Memory Chip Consumer Product Markets. Its conduct has injured ST and

22  competition in those markets.

23      115.    ST develops, markets, and sells both NOR and NAND flash memory chips and

24  certain consumer products that incorporate flash memory chips.

25      116.    ST has made substantial investments to develop and market flash memory chips and

26  certain consumer products that incorporate flash memory chips.

27      117.    Through its unlawful attempts to enforce its fraudulently-obtained patents, SanDisk

28  is seeking to force ST and other competitors to exit (and prevent additional competitors from

1   entering) the relevant Markets, pay SanDisk supra-competitive amounts to license its fraudulently-
2   obtained patents, and deter customers from purchasing chips manufactured without a SanDisk
3   license.

4       118.    SanDisk has succeeded in forcing many flash memory chip manufacturers to pay
5   SanDisk very large royalties or licensing fees through subjectively and objectively baseless lawsuits
6   and threats to bring such lawsuits.  Between 2004 and 2006, SanDisk earned over $744 million in
7   license and royalty revenues from licensing agreements.  In addition, through these lawsuits and
8   threats, SanDisk secured valuable cross licenses to the patent portfolios of many large
9   semiconductor companies, several of which are SanDisk's largest competitors.

10      119.    As alleged at paragraphs 97 to 113, SanDisk has engaged in a campaign of sham
11  legal actions against ST and others.  Through its sham legal actions, SanDisk has saddled ST with
12  massive legal fees associated with defending the actions and has harassed its customers, thereby
13  discouraging them from buying flash memory chips from ST.

14      120.    SanDisk has used its sham legal actions against ST and others to intimidate
15  manufactures (and potential manufacturers) of flash memory chips that have not licensed SanDisk's
16  technology.  SanDisk has repeatedly made clear it is trying to make an example out of ST and
17  threatened other NAND flash memory chip competitors that "they're next" to coerce them into
18  either exiting the market or agreeing to license its fraudulently obtained patents.

19      121.    SanDisk has threatened ST customers and on information and belief, customers of
20  other flash memory chip manufacturers that have refused to license SanDisk's technology that flash
21  memory chips cannot be manufactured without a license for SanDisk's technology.

22      122.    SanDisk has also asserted to ST customers and, on information and belief, customers
23  of other flash memory chip manufacturers that have refused to license SanDisk's technology that
24  ST and other manufacturers do not have a license to SanDisk's technology.

25      123.    SanDisk has threatened flash memory chip customers with the prospect that they will
26  be left holding large quantities of unusable ST flash memory chips manufactured by ST and others
27  that refuse to license SanDisk's technology are excluded from the U.S. market.  SanDisk has also
28  threatened ST's and other flash memory chip manufacturers' customers that they will be made to

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

1  purchase SanDisk flash memory chips at disadvantageous prices and terms if they are later forced to

2  turn to SanDisk to receive the necessary flash memory chips for their products

3      124.   SanDisk's threats have made buyers of flash memory chips unwilling to buy from ST

4  and other manufactures that have refused to license SanDisk's technology. Instead, those buyers of

5  flash memory have purchased chips that have been manufactured under license to SanDisk's

6  fraudulently obtained patents, resulting in SanDisk receiving super-competitive royalties.

7      125.   SanDisk's contention that ST requires a license to SanDisk's technology to

8  manufacture flash memory chips has injured and continues to injure ST by, among other things,

9  interfering with ST's ability to make sales of flash memory chips and reducing ST's profits.

10      126.   The foregoing and other anticompetitive effects from SanDisk's unlawful conduct

11  has and will continue to harm consumers in each of the relevant Markets:

12      **A.**    **Flash Memory Chip Technology Market**

13      127.   Through its unlawful conduct, SanDisk has monopolized or is attempting to

14  monopolize the Flash Memory Chip Technology Market. As a result of SanDisk's conduct, over

15  75% of all flash memory chips worldwide are now manufactured by various ventures that SanDisk

16  jointly controls with Toshiba Corporation to develop and manufacture flash memory chips or under

17  a license to SanDisk's fraudulently obtained patents.

18      128.   As a result of SanDisk's misconduct, ST and other flash memory chip manufacturers

19  have been required either to (a) pay supracompetitive license royalties or fees to SanDisk or (b)

20  incur huge litigation expenses and lost business opportunities through SanDisk's threats to flash

21  memory chip customers. SanDisk's conduct has prevented ST and other flash memory chip

22  manufacturers, which are consumers of Flash Memory Chip Technology, from making chips

23  without either licensing SanDisk's technology or suffering harm to their business from refusing to

24  do so, thereby injuring consumers and competition in the Flash Memory Chip Technology Market.

25      129.   Through its monopolization or attempted monopolization of the Flash Memory Chip

26  Technology Market, SanDisk has injured competition and consumers by, among other things,

27  inflating prices and decreasing competition, quality, and innovation for flash memory chip

28  technology.

1    **B.    Chip Market**

2       130.    Through its unlawful conduct, SanDisk has monopolized or is attempting to

3    monopolize the Chip Market. As a result of its conduct, SanDisk has succeeded in controlling over

4    75% of all flash memory chips and over 98% of all high-density flash memories manufactured

5    worldwide either by various ventures that SanDisk jointly controls with Toshiba Corporation to

6    develop and manufacture flash memory chips or by extracting massive royalties or licensing fees

7    from other manufacturers.

8       131.    As a result of SanDisk's misconduct, ST and other flash memory chip manufacturers

9    have been required either to (a) pay supracompetitive license royalties or fees to SanDisk or (b)

10   incur huge litigation expenses and lost business opportunities through SanDisk's threats to flash

11   memory chip customers. SanDisk's conduct has raised the costs of ST and other flash memory chip

12   manufacturers and impeded their competitiveness in the Chip Market, thereby injuring consumers

13   and competition in that Market.

14      132.    Through its monopolization or attempted monopolization of the Chip Market,

15   SanDisk has injured competition and consumers by, among other things, inflating prices and

16   decreasing competition, quality, and innovation for flash memory chips.

17   **C.    Flash Memory Chip Consumer Products Markets**

18      133.    Through its unlawful conduct, SanDisk has monopolized or is attempting to

19   monopolize Flash Memory Chip Consumer Product Markets in which SanDisk is a supplier.

20   SanDisk's anticompetitive conduct has raised its competitors' costs for procuring flash memory

21   chips, thereby raising their costs for producing consumer products that contain flash memory chips

22   and impairing their competitiveness in Flash Memory Chip Consumer Product Markets. In

23   addition, through its sham legal actions before the ITC, SanDisk has attempted to exclude

24   competing consumer products from the U.S. market through an ITC exclusion order.

25      134.    Through its monopolization or attempted monopolization of Flash Memory Chip

26   Consumer Product Markets, SanDisk has injured competition and consumers by, among other

27   things, inflating prices and decreasing competition, quality, and innovation for consumer products

28   that incorporate flash memory chips.

28

## COUNT ONE

### (Monopolization and Attempted Monopolization in Violation of § 2 of the Sherman Act: *Walker Process*)

135. ST incorporates the allegations of paragraphs 1 through 134 as though set forth here in their entirety.

136. SanDisk has achieved monopolies in the Flash Memory Chip Technology Market, the Chip Market, and Flash Memory Chip Consumer Product Markets, and by fraudulent omissions and misrepresentations in connection with the filing and prosecution of the '338 and '517 patents and efforts to enforce its fraudulently-obtained patents as set forth above, SanDisk has obtained and maintained its monopolies in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

137. Alternatively, by such fraudulent omissions, misrepresentations, and efforts to enforce its fraudulently-obtained patents, SanDisk has attempted to monopolize the Technology Market, the Chip Market, and Flash Memory Chip Consumer Product Markets with a specific intent to do so, and there is a dangerous probability that SanDisk will obtain monopolies, all in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

138. SanDisk is engaged in interstate and foreign commerce, and the vast majority of its past, present, and future sales in the relevant Markets will occur in such commerce.

139. As a direct and proximate result of SanDisk's unlawful conduct, competition in the relevant Markets has been severely harmed through higher prices and reduced competition, quality, innovation, and consumer choice to the detriment of consumers.

140. As a direct and proximate result of SanDisk's unlawful conduct, ST has been injured in its business or property in an amount that has yet to be determined but will be established at trial. Such damages include loss of past, present, and future profits; loss of customers and potential customers; loss of goodwill; and attorneys' fees and other legal expenses.

141. Unless SanDisk unlawful conduct is enjoined, SanDisk's anticompetitive conduct will continue and ST will suffer immediate and irreparable injury for which ST is without an adequate remedy at law. ST is informed and believes that SanDisk will continue to do the acts alleged herein unless the Court orders ST to cease and desist.

## COUNT TWO

### (Monopolization and Attempted Monopolization in
### Violation of Section 2 of the Sherman Act: *Handgards*)

142.    ST incorporates the allegations of paragraphs 1 through 141 as though set forth here in their entirety.

143.    SanDisk has obtained monopolies in the Technology Market, the Chip Market, and Flash Memory Chip Consumer Product Markets, and by sham legal actions and other conduct as set forth above, SanDisk has obtained and maintained its monopolies in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

144.    Alternatively, by such sham litigation and other conduct, SanDisk has attempted to monopolize the Technology Market, the Chip Market, and Flash Memory Chip Consumer Product Markets with a specific intent to do so, and there is a dangerous probability that SanDisk will obtain monopolies, all in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

145.    SanDisk is engaged in interstate and foreign commerce, and the vast majority of its past, present, and future sales in the relevant Markets will occur in such commerce.

146.    As a direct and proximate result of SanDisk's unlawful conduct, competition in the relevant Markets has been severely harmed through higher prices and reduced competition, quality, innovation, and consumer choice to the detriment of consumers.

147.    As a direct and proximate result of SanDisk's unlawful conduct, ST has been injured in its business or property in an amount that has yet to be determined but will be established at trial. Such damages include loss of past, present, and future profits; loss of customers and potential customers; loss of goodwill; and attorneys' fees and other legal expenses.

148.    Unless SanDisk unlawful conduct is enjoined, SanDisk's anticompetitive conduct will continue and ST will suffer immediate and irreparable injury for which ST is without an adequate remedy at law.  ST is informed and believes that SanDisk will continue to do the acts alleged herein unless the Court orders ST to cease and desist.

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

## COUNT THREE

### (Violations of California Business and Professional Code § 17200, *et seq.*)

149.    ST incorporates the allegations in paragraphs 1 through 148 as though set forth here in their entirety.

150.    SanDisk's conduct as alleged herein violates California Business and Professional Code § 17203.

151.    Specifically, SanDisk's conduct constitutes unlawful business acts or practices by violating: (1) Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and 37 C.F.R. § 1.56 (duty to disclose information material to patentability); (2) unfair business acts or practices by threatening an incipient violation of the antitrust laws, Federal Trade Commission Act, and 37 C.F.R. § 1.56, violating the spirit or policy of those laws, or because the effects of its misconduct are comparable to or the same as a violation of the law or because its conduct otherwise threatens competition; and (3) fraudulent business acts or practices because it is has deceived and is likely to continue to deceive the public.

152.    The foregoing acts and practices and the continuing course of SanDisk's anticompetitive conduct, have harmed and will continue to harm consumers and competition in California and elsewhere.

153.    SanDisk's anticompetitive and exclusionary conduct has directly and proximately caused injury to ST's business and property, as set forth above.  ST's injury is of the type this law is intended to prohibit.  Unless the activities complained of are enjoined, ST will suffer immediate and irreparable injury for which ST is without an adequate remedy at law.  ST is informed and believes that SanDisk will continue to do the acts alleged herein unless the Court orders SanDisk to cease and desist.

## COUNT FOUR

### (Intentional Interference with Contract)

154.    ST incorporates the allegations in paragraphs 1 through 153 as though set forth here in their entirety.

31

155.   SanDisk's conduct as alleged herein gives rise to common law liability for intentional interference with contractual, business, and economic relations.

156.   At all relevant times, ST had legally enforceable contractual, business, or economic relationships with third parties.

157.   At all relevant times, SanDisk knew of ST's valid and legally enforceable contractual, business, and economic relationships with third parties and that unlawful interference was certain or substantially certain to occur as a result of its tortuous and anti-competitive conduct.

158.   SanDisk's deliberate and primary purpose in engaging in the foregoing intentional acts and practices was to cause a breach or disruption of ST's contractual, business, and economic relations with third parties.

159.   The foregoing relationships would have provided economic and other benefits to ST but for SanDisk's tortuous and anti-competitive conduct.

160.   The foregoing acts and practices, and the continuing course of ST's tortuous and anti-competitive conduct, deliberately and directly resulted in actual breaches and disruptions of ST's contractual, business, and economic relations with third parties, which directly and proximately caused ST to suffer injury and damages to its business and property, as set forth above.

161.   SanDisk committed these tortuous acts with deliberate and actual malice, ill will, and specific knowledge that its actions constituted an outrageous, willful, and wanton disregard of ST's legal rights and expectations.

162.   Unless the activities complained of are enjoined, ST will suffer immediate and irreparable injury for which ST is without an adequate remedy at law.

### COUNT FIVE

### (Intentional Interference with Prospective Economic Advantage)

163.   ST incorporates the allegations in paragraphs 1 through 162 as though set forth here in their entirety.

164.   SanDisk's conduct as alleged herein gives rise to common law liability for intentional interference with prospective economic advantage.

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

165.    At all relevant times, ST had legitimate expectations of legally enforceable contractual, business, or economic relationships with third parties.

166.    At all relevant times, ST had a reasonable probability of entering into legally enforceable contractual, business, or economic relationships with third parties but for SanDisk's tortious and anti-competitive conduct.

167.    At all relevant times, SanDisk knew of ST's prospective contractual, business, and economic relationships with third parties and that unlawful interference was certain or substantially certain to occur as a result of its tortious and anti-competitive conduct.

168.    SanDisk's deliberate and primary purpose in engaging in the foregoing intentional acts and practices was to disrupt and thwart ST's prospective contractual, business, and economic relations with third parties.

169.    The foregoing relationships would have provided economic and other benefits to ST but for SanDisk's tortious and anti-competitive conduct.

170.    The foregoing acts and practices, and SanDisk's continuing course of tortious and anti-competitive conduct violate statutes, regulations, common law, and other determinable legal standards, and were and are wrongful independent of their impact on ST's prospects for economic advantage.

171.    The foregoing acts and practices, and the continuing course of ST's tortious and anti-competitive conduct, deliberately and directly resulted in disruptions of ST's prospective contractual, business, and economic relations with third parties.

172.    The foregoing acts and practices, and the continuing course of ST's tortious and anti-competitive conduct, directly and proximately caused ST to suffer injury and damages to its business and property, as set forth above.

173.    SanDisk committed these tortious acts with deliberate and actual malice, ill will, and specific knowledge that its actions constituted an outrageous, willful, and wanton disregard of ST's legal rights and expectations.

174.    Unless the activities complained of are enjoined, ST will suffer immediate and irreparable injury for which ST is without an adequate remedy at law.

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

## COUNT SIX

### (Declaration of Non-Infringement of the '338 Patent)

175.    ST incorporates the allegations of paragraphs 1 through 174 as though set forth here in their entirety.

176.    ST has not directly or indirectly infringed and is not directly or indirectly infringing the '338 Patent.

177.    ST is entitled to a declaratory judgment that is has not infringed and is not infringing the '338 patent and attorneys fees and costs because this is an exceptional case under 35 U.S.C. § 285.

## COUNT SEVEN

### (Declaration of Invalidity of the '338 Patent)

178.    ST incorporates the allegations of paragraphs 1 through 177 as though set forth here in their entirety.

179.    One or more claims of the '338 patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 102, 103, 112, and/or 116.

180.    ST is entitled to a declaratory judgment that one or more claims of the '338 patent are invalid and attorneys fees and costs because this is an exceptional case under 35 U.S.C. § 285.

## COUNT EIGHT

### (Declaration of Unenforceability of the '338 Patent)

181.    ST incorporates the allegations of paragraphs 1 through 180 as though set forth here in their entirety.

182.    The '338 patent is unenforceable against ST by reason of the inequitable conduct occurring in the prosecution and re-examination of the patent.

183.    Specifically, persons involved in the 1996 re-examination of the '338 patent on behalf of SanDisk knowingly made false and/or misleading representations to the USPTO that latch 721 of Figure 16 of the '338 patent was a "one-way" resettable latch as set forth above in paragraphs 62 through 64.

1      184.    The false representations made on behalf of SanDisk were material to the

2  patentability of one or more claims of the '338 patent, including, without limitation, claims 27

3  and/or 32.

4      185.    These false and/or misleading representations were made with the intent to deceive.

5      186.    In addition, persons involved in the 1996 re-examination of the '338 patent on behalf

6  of SanDisk intentionally failed to disclose material prior art references known to them and made

7  material misrepresentations concerning the content of the prior art, as set forth above in paragraphs

8  58 through 64 and 76 through 93.

9      187.    Specifically, one or more of the named inventors of the '338 patent, and attorneys

10  acting on behalf of SanDisk involved in the re-examination of the '338 patent were aware of one or

11  more prior art references disclosing "permanent inhibit," including, without limitation, the '179 and

12  the '259 patents (collectively, the "Simko Patents,") prior to the 1996 re-examination of the '338

13  patent.

14      188.    Despite this knowledge, the Simko Patents were not disclosed to the USPTO during

15  the re-examination of the '338 patent, and it was represented to the USPTO that "permanent inhibit"

16  was the inventive aspect of one or more claims of the '338 patent, including without limitation,

17  claims 27 and 32.

18      189.    The Simko Patents and the existence of "permanent inhibit" in the prior art were

19  material to issues of patentability considered by the USPTO during the re-examination of the '338

20  patent.

21      190.    Individuals involved in the reexamination of the '338 patent on behalf of SanDisk

22  knowingly withheld the Simko Patents with the intent to deceive the USPTO.

23      191.    Individuals involved in the reexamination of the '338 patent on behalf of SanDisk

24  knowingly made false and/or misleading statements concerning the existence of "permanent inhibit"

25  in the prior art with the intent to deceive the USPTO, as more fully set forth in paragraphs 58

26  through 64, *supra.*

27      192.    The '338 patent is also unenforceable against ST because the patent identifies the

28  incorrect inventive entity.

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

193.   Specifically, Winston Lee contributed Figs. 9D-9I to the '338 patent, each of which depict structures for simultaneously comparing a memory cell with multiple reference currents.

194.   Figures 9D-9I constitute corresponding structure to one or more limitations of one or more claims of the '338 patent that are written in means-plus-function.

195.   Figures 9D-9I are novel and are not simply a reduction to practice of a concept invented by any other named inventor.

196.   ST is entitled to a declaratory judgment that the '338 patent is unenforceable because of inequitable conduct and/or failure to name the correct inventive entity and attorneys fees and costs because this is an exceptional case under 35 U.S.C. § 285.

## COUNT NINE

### (Declaration of Non-Infringement of the '517 Patent)

197.   ST incorporates the allegations of paragraphs 1 through 196 as though set forth here in their entirety.

198.   ST has not directly or indirectly infringed and is not directly or indirectly infringing the '517 Patent.

199.   ST is entitled to a declaratory judgment that is has not infringed and is not infringing the '517 patent and attorneys fees and costs because this is an exceptional case under 35 U.S.C. § 285.

## COUNT TEN

### (Declaration of Invalidity of the '517 Patent)

200.   ST incorporates the allegations of paragraphs 1 through 199 as though set forth here in their entirety.

201.   One or more claims of the '517 patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 102, 103, 112, and or 116.

202.   ST is entitled to a declaratory judgment that one or more claims of the '338 patent are invalid and attorneys fees and costs because this is an exceptional case under 35 U.S.C. § 285.

## COUNT ELEVEN

### (Declaration of Unenforceability of the '517 Patent)

203. ST incorporates the allegations of paragraphs 1 through 202 as though set forth here in their entirety.

204. The '517 patent is unenforceable against ST by reason of inequitable conduct.

205. During the prosecution of the '517 patent, individuals involved in the prosecution of the application which resulted in the '517 patent ("'517 patent's application") on behalf of SanDisk intentionally withheld material prior art and made knowingly false and/or misleading material representations concerning the prior art to the USPTO, with the intent to deceive.

206. Specifically, and as more fully set forth above at paragraphs 76 through 85 and 88 through 90, individuals involved in the prosecution of the '517 patent's application were aware of several prior art references, including without limitation, the Simko Patents, GB 145, and JP-100, which disclosed "permanent inhibit" (these four references are referred to hereinafter collectively as the "Permanent Inhibit Prior Art").

207. Despite this knowledge, the Permanent Inhibit Prior Art was not disclosed to the USPTO.

208. The Permanent Inhibit Prior Art is material to the patentability of one or more claims of the '517 patent, including without limitation, claim 1.

209. Individuals involved in the prosecution of the '517 patent's application knowingly failed to disclose the Permanent Inhibit Prior Art with the intent to deceive.

210. In addition, individuals involved in the prosecution of the '517 patent's application knowingly made false and/or misleading statements material to the patentability of one or more claims of the '517 patent.

211. For example, SanDisk represented during the prosecution of the '517 patent's application that

> The principal purpose of the present application is to define the cell-by-cell inhibition programming feature without all the other limitations included in claim 27 of the '338 patent that are not necessary to its patentability. The feature of inhibiting programming on a cell-by-cell basis until all cells in a group are programmed (also referenced as "termination") is patentable by itself.

37

1     212.    The representation that "the feature of inhibiting programming on a cell-by-cell basis

2  until all cells in a group are programmed (also referenced as "termination") is patentable by itself"

3  was a false and/or misleading statement material to the patentability of one or more claims of the

4  '517 patent.

5     213.    At the time SanDisk made these representations, individuals involved in the

6  prosecution of the '517 patent's application, knew these representations were false and/or

7  misleading.

8     214.    SanDisk made these representations with the intent to deceive the USPTO.

9     215.    Individuals acting on behalf of SanDisk made numerous other material

10  misrepresentations to the USPTO during the prosecution of the '517 patent's application that were

11  knowingly false and/or misleading and made with the intent to deceive, including without

12  limitation, the misrepresentations set forth in paragraphs 94 through 96.

13     216.    The misrepresentations set forth in paragraphs 94 through 96 were made with an

14  intent to deceive the USPTO.

15     217.    ST is entitled to a declaratory judgment that the '517 patent is unenforceable by

16  reason of inequitable conduct and attorneys fees and costs because this is an exceptional case under

17  35 U.S.C. § 285.

18                           **PRAYER FOR RELIEF**

19     WHEREFORE, ST respectfully requests that this Court:

20          (a)    Enter judgment in favor of ST declaring that SanDisk has attempted to

21                  monopolize and has monopolized the relevant markets in violation of Section

22                  2 of the Sherman Act, 15 U.S.C. § 2;

23          (b)    Permanently enjoin SanDisk, its respective officers, agents, servants,

24                  directors, and employees, and all persons in active concert or participation

25                  with each, from monopolizing and attempting to monopolize the relevant

26                  markets under Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 4(a), 26;

27

28

ANSWER AND COUNTERCLAIMS
Case No. C 04-4379-JF; C 05-5021-JF

(c)   Permanently enjoin SanDisk from enforcing or attempting to enforce the SanDisk patents against ST;

(d)   Enter judgment in favor of ST declaring that SanDisk has violated California Business and Professional Code § 17200, *et seq.*, award ST restitution insofar as appropriate, and permanently enjoin SanDisk from violations of that section;

(e)   Enter judgment in favor of ST declaring that SanDisk has tortiously interfered with ST's contractual relations, and permanently enjoin SanDisk from doing so;

(f)   Enter judgment in favor of ST declaring that SanDisk has tortiously interfered with ST's prospective economic advantage, and permanently enjoin SanDisk from doing so;

(g)   Dismiss the Second Amended Complaint in its entirety, with prejudice;

(h)   Enter judgment in favor of ST and against SanDisk with respect to the Second Amended Complaint;

(i)   Declare that ST has not infringed, and is not infringing, the SanDisk Patents;

(j)   Declare that one or more claims of the SanDisk patents are invalid, void, and/or unenforceable against ST;

(k)   Retain jurisdiction for the purpose of enabling ST to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of any orders made in this action, for the modification of any such orders, for the enforcement of compliance therewith and the punishment of any violations thereof;

(l)   Award ST actual and compensatory damages, including but not limited to lost profits and attorneys' fees, trebled as provided by law, plus interest;

(m)   Award ST punitive and exemplary damages as the law shall permit or the jury shall find, plus interest;

| | | |
|---|---|---|
| 1 | (n) | Declare this case to be an "exceptional case" within the meaning of 35 U.S.C. |
| 2 | | § 285; |
| 3 | (o) | Award ST its attorneys' fees and costs incurred in this action, with interest; |
| 4 | | and |
| 5 | (p) | Award such other and further relief as the Court may deem just and proper. |

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), ST hereby demands a trial by jury on all claims that are properly subject to a jury trial.

Dated: September 6, 2007

Respectfully submitted,

WILMER CUTLER PICKERING
HALE and DORR LLP

By:  s\ Mark D. Selwyn
    Mark D. Selwyn (SBN 244180)
    mark.selwyn@wilmerhale.com
    WILMER CUTLER PICKERING HALE
    AND DORR LLP
    1117 California Avenue
    Palo Alto, California 94304
    Telephone:   (650) 858-6000
    Facsimile:   (650) 858-6100

James L. Quarles III (*pro hac vice*)
james.quarles@wilmerhale.com
James M. Dowd (*pro hac vice*)
james.dowd@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, DC 20006
Telephone:   (202) 663-6000
Facsimile:   (202) 663-6363

Attorneys for Defendants
STMICROELECTRONICS, INC. and
STMICROELECTRONICS N.V.

**Certificate of Service**

I, Rebecca McNew, declare the following:  I am a citizen of the United States and reside in the State of California.  I am employed in Santa Clara County, State of California.  I am over the age of eighteen years, and not a party to the within action.  My business address is 1117 California Avenue, Palo Alto, California, 94304.

On September 6, 2007, I served the foregoing document(s) described as:

- **ANSWER TO SECOND AMENDED COMPLAINT AND COUNTERCLAIMS**

Service by Electronic Mail

**Michael A. Ladra**                           Attorneys for SanDisk
**James C. Yoon**                              Corporation
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Email: mladra@wsgr.com
Email: jyoon@wsgr.com

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on September 6, 2007 at Palo Alto, California.

_____
Rebecca McNew

Case No. C 04-4379 JF; C 05-5021 JF

US1DOCS 6257349v2