**E-Filed 10/17/2008**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SANDISK CORPORATION,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>STMICROELECTRONICS, INC. et al.,<br><br>　　　　Defendants. | Case Number C 04-4379 JF (RS)<br><br>ORDER[1] GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT<br><br>[re: doc. no. 175] |

　　　Plaintiff SanDisk Corp. ("SanDisk") moves for summary judgment as to the counterclaims of Defendant STMicroelectronics, Inc. ("ST") for fraud, maintaining sham litigation, and unfair competition.[2]  The underpinning of SanDisk's motion is that there is insufficient evidence for a reasonable jury to find that SanDisk intended to defraud the United States Patent and Trademark Office ("USPTO").  ST opposes the motion by presenting several instances of allegedly material representations and omissions before the USPTO, and asserts that there are sufficient factual issues regarding SanDisk's intent to deceive so as to preclude a ruling on summary judgment for all of the counterclaims.  For the reasons set forth below, SanDisk's

---

[1] This disposition is not designated for publication in the official reports.

[2] At issue are ST's counterclaims 1 through 5.

motion will be granted as to ST's claims for maintaining sham litigation and for unfair competition and will be denied as to ST's claims for fraud.

## I. BACKGROUND

The facts relevant to the instant motion are set forth in the light most favorable to ST as the nonmoving party. *See Barlow v. Ground*, 943 F.2d 1132, 1134 (9th Cir. 1991). SanDisk's second amended complaint ("SAC") accuses ST of infringing two SanDisk patents, US Patent Nos. 5,172,338 ("the '338 patent") and 5,991,517 ("the '517 patent"). The '338 patent, which claims a priority date of April 13, 1999, was filed on April 11, 1990 and issued on December 15, 1992. According to its abstract, the '338 patent describes "[i]mprovements in the circuits and techniques for read, write and erase of EEprom memory [that] enable non-volatile multi-state memory to operate with enhanced performance over an extended period of time."

The '517 patent was filed on December 30, 1996 and issued on November 23, 1999. The '517 patent also relates to EEprom technology, and it discloses a "system of Flash EEprom memory chips with controlling circuits [that] serves as non-volatile memory such as that provided by magnetic disk drives." '517 patent abstract. The priority of the '517 patent also dates back to 1989, as the application from which it derives was filed on the same date as the '338's parent application. The '517 patent technically is not a member of the '338 patent family, but the '338 patent was incorporated by reference into the application for the '517 patent, and the '517 patent was intended to cover subject matter not claimed by the '338 patent. The '517 and '338 patents have two co-inventors in common, Eliyahou Harari ("Harari") and Sanjay Mehrotra ("Mehrotra").

### A. 1996 ITC Investigation and '338 Patent Reexamination

On January 11, 1996, SanDisk filed a complaint with the International Trade Commission ("ITC") for alleged infringement of the '338 patent by Samsung Electronics ("Samsung"). This action initiated the ITC's "382" Investigation. During the 382 Investigation, potential anticipatory prior art was discovered, prompting Samsung to request reexamination of the '338 patent by the USPTO. This prior art was a 1983 article by a former ST employee, Guido Torelli. Samsung also cited commercial embodiments of the technology described in the Torelli article,

Case 5:04-cv-04379-JF   Document 273   Filed 10/17/08   Page 3 of 18

1  specifically ST's M293 product.  Samsung claimed (as ST claims now) that the Torelli article
2  and the M293 product disclose an EEprom function where incremental charges are added to the
3  EEprom until an individual cell reads in the correct state, and once the correct charge is attained
4  the application of any additional charge is inhibited so long as the cell is in its correct state.  In
5  technical parlance, this is referred to as "incremental" or "temporary" inhibit.
6       During reexamination, Samsung argued that the Torelli prior art rendered certain claims
7  invalid as anticipated and/or obvious.  For example, claim 27 of the '338 patent reads in part:

> means for inhibiting further programming of correctly verified cells
> among the plurality of addressed cells; and means for further
> programming and verifying in parallel the plurality of addressed
> cells and inhibiting programming of correctly verified cells until all
> the plurality of addressed cells are verified correctly.

11  '338 patent, claim 27.  Samsung contended that this claim limitation described incremental, cell-
12  by-cell inhibition.  In rebuttal, SanDisk asserted that the inhibit function described by claim 27
13  was not temporary or incremental inhibit, but rather a function known as "permanent inhibit."
14  SanDisk supported its position by claiming that the specification of the '338 patent disclosed a
15  permanent inhibit function, and in particular that latch 721 in Figure 16 was a one-way latch,
16  which persons of ordinary skill in the art generally agree is required for permanent inhibit
17  functionality.  The USPTO eventually sided with SanDisk, stating "the inhibiting feature recited
18  in claims of the '388 [sic] patent is enabled by latch 721 in figure 16 which is a one way
19  resettable latch."  Notice of Intent to Issue Reexamination Certificate at 4, April 16, 1997.
20       In the instant case, ST asserts that SanDisk's arguments to the USPTO regarding
21  permanent inhibit were intentional misrepresentations for the purpose of preserving the validity
22  of the '338 patent.  In support of this allegation, ST has presented multiple deposition excerpts in
23  which one of the co-inventors of the '338 patent takes arguably inconsistent positions as to how a
24  person of ordinary skill would construe claim 27 and latch 721.  SanDisk's expert also has
25  testified that the '338 patent arguably discloses only temporary inhibit.  The record shows that at
26  least one of the co-inventors of the '338 patent was aware of the permanent inhibit argument
27  being made to the USPTO during reexamination.  ST also alleges that SanDisk failed to disclose
28  to the USPTO that the vast majority of latches drawn in a form identical to latch 721 in fact are

3
Case No. C 04-4379 JF (RS)
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

two-way latches. For example, SanDisk did not disclose an article written by Harari and Mehrotra in 1992 (the "VLSI article"), in which a latch identical to 721 is portrayed as a two-way latch.

Similarly, ST alleges that certain prior art was intentionally withheld from the USPTO to preserve SanDisk's argument that permanent inhibit was in fact novel. In particular, ST points to two patents invented by Richard Simko ("Simko"), as well as a United Kingdom Patent application known as GB145. These three references were entered into a searchable database used by SanDisk's patent counsel in 1996, several months before the '338 reexamination.[3] ST argues that SanDisk was well aware of the Simko references during the reexamination, not only because the references were entered into the searchable database but also because SanDisk's patent counsel had cited the Simko patents several years earlier while prosecuting another patent invented by Harari containing claims related to inhibition mechanisms. In addition, SanDisk had hired Mr. Simko in March 1996 as a litigation consultant for the ITC 382 Investigation.

### B. Prosecution of the '517 Patent

The prosecution of the '517 patent coincided with the ITC 382 Investigation and with the USPTO's reexamination of the '338 patent. ST alleges that the chain of events beginning with the reexamination of the '338 patent bears directly upon the prosecution of the '517 patent and thus upon the latter patent's validity. As stated previously, the '517 patent was intended, at least in part, to claim a permanent inhibit function without several of the claim limitations that exist in the '338 patent. More importantly, however, ST asserts that the successful prosecution of the '517 patent depended upon the alleged novelty of permanent inhibit. As alleged by ST, SanDisk again failed to disclose the two Simko patents and GB145 to the USPTO, nor did SanDisk disclose a Japanese reference known as JP100. JP100 was entered into the database of SanDisk's patent counsel in 1998, almost a year prior to the issuance of the '517 patent. The relevance of JP100 is demonstrated by the fact that (1) in 1998, the USPTO used JP100 to reject claims in a

---

[3] SanDisk's primary patent counsel was the same individual throughout all relevant time periods.

SanDisk patent application involving technology similar to that of the '517 patent; and (2) in 2001, claim 1 of the Japanese counterpart of the '517 patent was rejected by the Japanese patent office in light of JP100.

### C.  The 2004 ITC Investigation

On October 15, 2004, SanDisk filed a complaint with the ITC alleging that certain ST flash memory chips infringed the '338 patent.  This complaint initiated the ITC "526" Investigation. On October 19, 2005, the administrative law judge ("ALJ") in the 526 Investigation found that ST had not infringed the '338 patent.  The ALJ also found that the '338 patent was valid and enforceable.[4]  ST alleges, however, that the ALJ was not made aware of key prior art (*i.e.*, GB145, JP100, and the Simko patents), and that the ALJ did not have an opportunity to consider the alleged admissions and contradictory statements by Mehrotra and a SanDisk expert witness regarding the functionality of latch 721.

### D.  The 2006 ITC investigation

In January 2006, SanDisk filed a second ITC complaint against ST, which led to the ITC's "560" Investigation.  In that action, SanDisk asserted both the '338 and '517 patents against a different subset of ST products.  ST asserts that the allegations behind the 560 Investigation were objectively baseless, because any meaningful preliminary investigation by SanDisk would have revealed that the accused ST products utilized only the temporary inhibit function.  ST further alleges that SanDisk's discovery practices during the 560 Investigation drove away ST's customers.

On June 1, 2007, the ALJ dismissed SanDisk's allegations involving the '338 patent because SanDisk had failed to demonstrate domestic industry.  The ALJ observed that "SanDisk, acting in haste, subjected ST to months of relitigating the '338 patent, wasting both public and private resources." ITC 560 Investigation Initial Determination at 45-46, June 1, 2007.  While the ALJ did find that ST had infringed the '517 patent, the ALJ also determined that the '517

---

[4] ST asserts that the ALJ's finding regarding validity was vacated on appeal, but in reality the ITC appeals board declined to take a position with respect to the validity issues.  ST argues that this means that the ALJ's finding was "vacated."

1  patent was invalid as anticipated and/or obvious in light of GB145, JP100 and one of the Simko
2  patents.  The ALJ did not rule on ST's inequitable conduct allegations.  However, the
3  post-hearing brief filed by ITC staff, while stopping short of recommending that the '517 should
4  be held unenforceable because of inequitable conduct, did conclude that GB145, JP100, and the
5  Simko patent were material references.  The staff brief also noted that while there was
6  circumstantial evidence of intent to deceive the USPTO, the fact that it was SanDisk's patent
7  counsel, and not the inventors, who withheld the prior art weakened any inference of intent,
8  because patent counsel had no apparent motive to deceive the USPTO.

### E.  The Instant Action

On the same day that the 526 Investigation began, SanDisk filed a declaratory relief action in this Court challenging fourteen ST patents and alleging infringement of the '338 patent by ST.  On December 6, 2005, one day after the ITC affirmed the ALJ's finding in the 526 Investigation, SanDisk filed a second action in this Court, alleging infringement of the '517 patent by ST.  On August 2, 2007, SanDisk filed the operative SAC, which consolidated the two separate suits into the instant litigation.

## II.  APPLICABLE LEGAL STANDARD

Summary judgment should be granted only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, or other evidence that demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets this initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  *See also Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000) ("a moving party without the ultimate burden of persuasion at trial does not carry its initial burden of production if it fails to produce affirmative evidence negating an essential element of the nonmoving party's claim or defense.").

A genuine issue for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Anderson*, 477 U.S. 242, 248-49. *See also Dark v. Curry County*, 451 F.3d 1078, 1082 (9th Cir. 2006) ("the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial."). Determining credibility, the weighing of evidence, and drawing conclusions from the facts are functions of the jury, not the judge, and should be reserved for trial. *See Anderson*, 477 U.S. at 255.

### III.  DISCUSSION

"A patentee who brings an infringement suit may be subject to antitrust liability for the anti-competitive effects of that suit if the alleged infringer (the antitrust plaintiff) proves (1) that the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965), or (2) that the infringement suit was 'a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.'" *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (Fed. Circ. 1999) (citation omitted). A finding of fraud under *Walker Process* will strip a patent of its validity. *See id.* at 1069-70. Similarly, a patentee found liable for sham litigation will lose the antitrust immunity that normally protects the right to enforce its patent. *See id.* at 1072. Whether conduct constitutes *Walker Process* fraud and/or sham litigation is governed by Federal Circuit law. *Id*. at 1067-68.

ST claims that SanDisk's actions amounted to fraud on the USPTO, and that both the '338 and '517 patents thus should be declared unenforceable. ST also claims that the assertion of these fraudulently obtained patents in the instant action constitutes sham litigation, in violation of Section 2 of the Sherman Act and in violation of California state law prohibiting unfair competition.

### A.  *Walker Process* counterclaim

A successful *Walker Process* claimant must show that (1) the patent at issue was procured

7

by knowing or willful fraud; and (2) the defendant then used the fraudulently obtained patent to restrain competition. *C.R. Bard, Inc. v. 3M Sys., Inc.*, 157 F.3d 1340, 1367 (Fed. Cir. 1998). The fraud element is essentially the same as with common law fraud, which requires an intentional misrepresentation or omission of a material fact, and such misrepresentation or omission is then relied upon, causing injury to the deceived party. *See, e.g.*, *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1358 (Fed. Cir. 2004), *rev'd on other grounds*, 546 U.S. 394 (2006).[5] Upon a showing of fraud, the *Walker Process* claimant then must prove an antitrust injury under the law of the regional circuit. *Unitherm*, 375 F.3d 1341.

There is no dispute that SanDisk has used the patents at issue to encourage – or, in ST's view, force – competitors to enter into license agreements or else face the prospect of infringement litigation. Such actions are entirely permissible when the patents are lawfully procured. *See C.R. Bard*, 157 F.3d at 1369. The parties do not contest this issue or the aggressiveness of SanDisk's actions. Accordingly, the resolution of the present motion does not require a detailed antitrust injury analysis.

However, the parties do disagree as to whether ST has presented sufficient evidence of fraud to survive a motion for summary judgment. Specifically, the parties differ over two essential elements: (1) whether any of the previously discussed prior art references or representations to the USPTO were sufficiently material to affect the USPTO's determinations regarding patentability of the '338 and '517 patents; and (2) whether a reasonable jury could find that SanDisk had the requisite level of intent from the evidence before the Court. ST's *Walker Process* claim (and SanDisk's defense to that claim) rise or fall on these two issues.[6]

---

[5] *Walker Process* fraud essentially is a more egregious version of inequitable conduct. "To demonstrate *Walker Process* fraud, a claimant must make higher threshold showings of both materiality and intent than are required to show inequitable conduct." *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346 (Fed. Cir. 2007).

[6] The parties do not disagree (nor could they) regarding the additional fraud elements of reliance and injury. For example, if SanDisk intentionally withheld material prior art, then reliance is evident from the fact that the USPTO issued the patent. *See Unitherm*, 375 F.3d at 1361. Likewise, injury to the USPTO and the public occurs as a matter of course when an otherwise invalid patent is issued. *Id.*

### 1. Materiality

The materiality requirement under *Walker Process* requires a showing "that the patent would not have issued *but for* the misrepresentation or omission." *Nobelpharma*, 141 F.3d at 1071 (emphasis added). *See also C.R. Bard*, 157 F.3d at 1364 ("but for which misrepresentation or deliberate omission the patent would not have been granted."). SanDisk argues that any reasonable jury would conclude that the '338 and '517 patents still would have issued even if the USPTO had been presented with the VLSI article, GB145, JP100 or the Simko patents during prosecution of either the '338 or '517 patents. In other words, according to SanDisk, none of these references satisfies the required "but for" materiality test.

The evidence presented suggests otherwise, especially with respect to the '517 patent. For example, GB145, JP100 and one of the Simko patents were used by the ALJ in the 560 Investigation to invalidate the '517 patent. A reasonable jury could find that the '517 patent would not have issued, or at least would have issued with significantly narrower claims, had any one of these references been presented to the examiner during prosecution. Moreover, the fact that the references were omitted rather than the subject of an affirmative misrepresentation does not affect their materiality. *See Nobelpharma*, 141 F.3d at 1070 ("a fraudulent omission can be just as reprehensible as a fraudulent misrepresentation.").

For the '338 patent, the primary act in question was an affirmative representation – namely, SanDisk's argument that latch 721 was a one-way latch, and thus certain claims (*e.g.*, claim 27) encompass permanent inhibit. ST alleges that this representation enabled SanDisk to argue successfully to the USPTO that the '338 patent claimed permanent inhibit, which distinguished the patent's subject matter over highly relevant prior art. Assuming that SanDisk's argument to the USPTO was a misrepresentation, it clearly was material. The record shows that permanent inhibit was a central issue in the USPTO's reexamination of the '338 patent.

In its defense, SanDisk argues that it never claimed that latch 721 "necessarily" was a one-way latch, and that it admitted to the USPTO that latch 721 could be either a one-way or a two-way latch. SanDisk also relies upon *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1326 (Fed. Cir. 2000) for the proposition that an argument to the USPTO advocating a particular

9

claim construction cannot rise to the level of a material misrepresentation if the examiner considers contrary evidence and reaches his own conclusion through independent analysis. This Court concludes that the ultimate determination as to how the examiner arrived at his final decision is a question for the jury. *See Monsanto Co. v. Bayer Bioscience N.V.*, 363 F.3d 1235 1240-42 (Fed. Cir. 2004) (whether representations are "false or misleading" is an issue of material fact).

Finally, GB145 and the Simko patents, both of which are alleged to disclose permanent inhibit, were not presented to the USPTO during reexamination. Their omission conceivably protected SanDisk's position that permanent inhibit was novel. Nor was the VLSI article, which contained a two-way latch drawn very similar to the allegedly one-way latch 721, presented to the USPTO despite having been authored by the inventors themselves. The examiner may not have agreed with SanDisk's position regarding latch 721 had the VLSI article been considered.

Accordingly, the Court concludes that there is sufficient evidence to preclude summary judgment regarding the materiality of the alleged misrepresentations and omissions with respect to both the '338 and '517 patents.[7] A jury should be allowed to make the ultimate determination of whether SanDisk's arguments and the omitted prior art were sufficiently material for liability under *Walker Process*.

---

[7] This conclusion is consistent with the definition of materiality under 37 C.F.R. 1.56(b):
> Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
> (i) Opposing an argument of unpatentability relied on by the Office, or
> (ii) Asserting an argument of patentability.

2.  Intent

A successful *Walker Process* claim "must be based on independent and clear evidence of deceptive intent." *Nobelpharma*, 141 F.3d at 1071. The required scienter is an "intent to deceive, or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent." *Id.* at 1069. This intent requirement is a high bar that often results in adjudication in favor of the *Walker Process* defendant at summary judgment. *See*, *e.g.*, *Fuji Photo Film Co Ltd. v. Jazz Photo Corp. Inc.*, 173 F. Supp. 2d 268, 276 (D.N.J. 2001). However, the Court is also mindful that "[g]ood faith, intent to deceive, scienter, honest mistake are all questions of fact" that if legitimately contested are inappropriate for resolution at summary judgment. *KangaROOS U.S.A., Inc. v. Caldor*, Inc., 778 F.2d 1571, 1573 (Fed. Cir. 1985). *See also Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962) ("summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.").

SanDisk argues that ST has not presented independent evidence of any intent to deceive the USPTO. SanDisk suggests that the instant case presents a scenario similar to that before the Federal Circuit in *Dippin' Dots*. *See* 476 F.3d at 1347. In finding that there was insufficient evidence of intent in that case, the Federal Circuit noted that the *Walker Process* claimant had not submitted *any* evidence as to why the prior art had been omitted. *See id.* The court held that regardless of how material an omitted reference might be, "allowing the high materiality of the omission to be balanced against a lesser showing of deceptive intent by the patentee" would eliminate the requirement of independent and clear evidence of intent, and essentially merge a *Walker Process* claim with inequitable conduct. *Id.* at 1348.[8]

---

[8] The Federal Circuit has offered the following useful analogy to distinguish inequitable conduct from *Walker Process* fraud: "[i]nequitable conduct is thus an equitable defense in a patent infringement action and serves as a shield, while a more serious finding of *[Walker Process]* fraud potentially exposes a patentee to antitrust liability and thus serves as a sword." *Nobelpharma*, 141 F.3d at 1070. Accordingly, the scienter requirement for inequitable conduct is much lower: a "conclusion of inequitable conduct may be based on evidence of a lesser

The facts surrounding SanDisk's omissions more closely resemble those of *Nobelpharma*. In *Nobelpharma*, the prosecuting patent agent withheld discussion of a prior art reference that had appeared in a previous draft of the application. 141 F. 3d at 1062. After the patent issued, the patent owner initiated litigation against various competitors. When the co-inventor was deposed in connection with the litigation, he proffered testimony that was inconsistent as to whether a full disclosure had been made to the USPTO. *Id.* at 1363. The Federal Circuit noted that a jury was free to disbelieve an explanation by the patent agent that he did not recall the prior art in question and would have submitted had he believed it to be relevant. *Id.* at 1072. When confronted with an omission and a questionable explanation as to why the reference was omitted, "the jury could have properly inferred that [the patentee] had the requisite intent to defraud the PTO based on his failure to disclose the reference to the PTO." *Id*.

As in *Nobelpharma*, the record in this case contains independent circumstantial evidence of intent regarding SanDisk's omissions. For example, SanDisk's patent counsel had relevant prior art in a searchable database designed to ensure compliance with disclosure obligations, but this prior art was not disclosed during the either '338 reexamination or the '517 prosecution. The Simko patents had been cited by the same patent counsel in an earlier Harari patent application, but they subsequently were omitted during the prosecution of the '517 patent. The inference of intent grows when one considers the fact that Simko had been hired by SanDisk in connection with the '338 reexamination. There also are legitimate questions regarding the omission of JP100, which also was entered into the searchable database, and SanDisk's patent counsel has made arguably conflicting statements regarding his familiarity with that reference. One of the co-inventors of the '338 patent has offered testimony that raises questions about the accuracy of SanDisk's representations to the USPTO during the '338 reexamination. As a whole, a reasonable jury could infer an intent to deceive from these events.[9]

---

misrepresentation or an omission, such as omission of a reference that would merely have been considered important to the patentability of a claim by a reasonable examiner." *Id*.

[9] SanDisk attempts to distinguish *Nobelpharma* from the instant case by noting that *Nobelpharma* also involved admissions by employees who essentially acknowledged that fraud

ST concedes that when examined in isolation, the individual omissions may not support a *Walker* Process claim. Yet when the omissions (as well as the affirmative representations to the USPTO regarding latch 721 and permanent inhibit) are viewed as an overall scheme to deceive in order to preserve the validity of the '338 and '517 patents, there is sufficient evidence of intent to support ST's the claim. *See Nobelpharma*, 141 F.3d at 1072 ("Such a scheme to defraud is the type of conduct contemplated by *Walker Process*.").

SanDisk's arguments made to the USPTO during the reexamination of the '338 patent do not require clear and independent evidence of intent. The Federal Circuit has stated that "[a] false or clearly misleading prosecution statement may permit an inference that the statement was made with deceptive intent." *Dippin' Dots*, 476 F.3d at 1347. Here, the statements regarding permanent inhibit made to the USPTO during the reexamination of the '338 patent are arguably in conflict with statements made by one of the co-inventors of the '338 patent and SanDisk's own expert. Accordingly, determination of SanDisk's underlying intent regarding the presently alleged sequence of events is not appropriate for resolution on summary judgment. *See Banner Pharmacaps Inc. v. Perrigo Co.*, No. 1:04 CV 492, 2005 WL 2136927, at *5 (M.D.N.C. Aug. 1, 2005) ("Defendant has produced summary judgment evidence that sufficiently raises the issues of whether Plaintiff intentionally misled and deceived the examiner by misrepresenting the 'state of the art' during the appeal stage of the patent prosecution, used an inappropriate subjective double standard to assess the 'state of the art,' failed to disclose prior art teachings that directly contradicted its statements made to the examiner, and cited only those relevant documents that supported its arguments and not those which were contrary to its arguments.").

### B. Sham Litigation Counterclaim

A patentee may incur antitrust liability for sham litigation if it asserts a patent that it knows to be false with an intent to restrain competition. *See C.R. Bard*, 157 F.3d 1368. The Supreme Court has established a two-prong test for determining sham litigation liability. "First,

---

had been committed. *See* 141 F.3d at 1072-73. While such a "smoking gun" certainly makes a finding of fraud easier, the lack of such evidence does not mean that fraud did not occur.

the lawsuit must be so objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures*, 508 U.S. 49, 60 (1993) ("*PRE*"). "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome," then the patentee retains its antitrust immunity and cannot be found liable for sham litigation. *Id*. Litigation is not objectively baseless "as long as a similarly situated reasonable litigant could have perceived some likelihood of success." *PRE*, 508 U.S. at 65. "Similarly situated" means that the reasonable litigant would be aware of all relevant circumstances known to the patentee. *See id.* at 65. *See also Abbott Lab. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408, 428 (D. Del. 2006) ("Plaintiffs' allegations concerning the objective prong necessarily include the information about inequitable conduct that was available to Defendants when they decided to pursue the lawsuits.").

If the "objective" prong is satisfied, then a court will examine the patentee's subjective motivation in bringing suit. *Id.* The subjective prong requires a court to "focus on whether the baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor.'" *Id.* (citations omitted). This second prong is relevant only if a suit is found to be objectively baseless. *See id.* ("This two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability."). *See also Nobelpharma*, 141 F.3d at 1072 ("if a suit is not objectively baseless, an antitrust defendant's subjective motivation is immaterial."). As is the case with ST's *Walker Process* claim, the antitrust injury (*i.e.*, subjective) prong of the sham litigation allegation is not at issue in the present motion.

SanDisk argues that an objectively reasonable litigant could have believed that assertion of the '338 and '517 patents against ST in this Court would result in a favorable outcome. Normally, a patentee need only have "a reasonable belief that there is a chance that a claim *may* be held valid upon adjudication." *PRE*, 508 U.S. at 62-63 (citations and quotations omitted) (emphasis added). Here, SanDisk asserts that certain aspects of the ITC litigation – for example, the ruling that ST infringed the '517 patent and that the '338 patent was valid and enforceable – created a reasonable expectation of success on those same issues now before this Court. In

addition, the ITC declined to find SanDisk liable for inequitable conduct in connection with the prosecution of the '517 patent.[10]

The Court agrees that the results of the ITC investigations prevent a finding of sham litigation. While the two ITC actions ultimately were resolved in ST's favor, SanDisk successfully litigated one of the primary bases of ST's current sham litigation claim – that the '517 patent is invalid due to misconduct before the USPTO. Past litigation success bars a sham litigation claim. *See PRE*, 508 U.S. at 61 n.5 ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."); *Abbott Lab. v. Mylan Pharm., Inc.*, No. 05 C 6561, 2007 WL 625496, at *4 (N.D. Ill. Feb. 23, 2007) (sham litigation claim barred by "prior litigation upholding the same patents").

Moreover, while there may be legitimate issues regarding SanDisk's conduct before the USPTO, such conduct has not been determined definitively to constitute *Walker Process* fraud or even inequitable conduct. A jury eventually may find that SanDisk committed fraud, but at this stage of the litigation either party may prevail with respect to the fraud claim. Thus, ST's sham litigation claim fails as a matter of law. *See Abbott Lab.*, 2007 WL 625496, at *3 ("If an antitrust defendant had probable cause to institute proceedings, requiring only 'a reasonable belief that there is a chance that a claim may be held valid upon adjudication,' the antitrust defendant cannot be found to have engaged in sham litigation.") (citation omitted). *See also PRE*, 508 U.S. at 61 n.5 ("The court must remember that '[e]ven when the law or the facts appear questionable at the outset, a party may have an entirely reasonable ground for bringing suit.'") (citation omitted).

C.  State Law Claims

Federal patent law preempts claims for unfair competition under California law unless the

---

[10] The success or failure of the parties in litigation before the ITC has limited relevance in the present analysis, as decisions by the ITC are not binding on district courts, and it is not unusual for a party to litigate a claim in both a district court and before the ITC. *See Texas Instruments Inc. v. Tessera, Inc.*, 231 F.3d 1325, 1330 (Fed. Cir. 2000) ("For alleged infringement through importation, a patentee can....file an action in a district court or in the ITC. In fact, a patentee can bring suit both in a district court and in the ITC against an alleged infringer who is importing an allegedly infringing product.") (internal citations omitted).

case involves objectively baseless allegations of infringement. *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004). Therefore, the survival of the state law claims thus depends on the Court's ruling regarding ST's sham litigation claim. *Id.* at 1375-76. Because the Court finds that there is insufficient evidence of sham litigation to survive summary judgment, SanDisk's motion for summary judgment as to ST's state law claims will be granted.

### III. CONCLUSION

Accordingly, for the reasons set forth above IT IS HEREBY ORDERED that SanDisk's motion for summary judgment is GRANTED as to ST's claims for maintaining sham litigation and for unfair competition, and DENIED as to ST's claims for fraud.

DATED: October 17, 2008

_____
JEREMY FOGEL
United States District Court

Case No. C 04-4379 JF (RS)
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

This Order has been served upon the following persons:

Ariana M. Chung-Han    achung@wsgr.com, mcarrillo@wsgr.com

Deborah Colella    deborah.colella@wilmerhale.com

Georgia Kloostra VanZanten    gvanzanten@sidley.com, eleiva@sidley.com

Gregory H. Lantier    gregory.lantier@wilmerhale.com

James Carl Otteson    jotteson@wsgr.com

James Chung-Yul Yoon    jyoon@wsgr.com, abaranski@wsgr.com, nfurino@wsgr.com

James L. Quarles , III    james.quarles@wilmerhale.com

James M. Dowd    james.dowd@wilmerhale.com

Joseph R Baldwin    joseph.baldwin@wilmerhale.com

Julie M. Holloway    jholloway@wsgr.com, abaranski@wsgr.com, rpezzimenti@wsgr.com

Kevin C. Heffel    kevin.heffel@wilmerhale.com

Leeor Neta    leeor.neta@wilmerhale.com, bernadette.jamili@wilmerhale.com

Lisa Davis    ldavis@wsgr.com

Mark Daniel Selwyn    mark.selwyn@wilmerhale.com, lorna.ejercito@wilmerhale.com

Matthew Laurence McCarthy    matthew.mccarthy@usdoj.gov, hui.chen@usdoj.gov

Michael A. Ladra    mladra@wsgr.com

Nina S. Tallon    nina.tallon@wilmerhale.com

Russell L. Johnson    rljohnson@sidley.com, sheila.brown@sidley.com

Ryan R. Smith    rsmith@wsgr.com, tnero@wsgr.com

Tracey Cote Allen    Tracey.Allen@WilmerHale.com

J Michael Heinlen
Thompson & Knight LLP
1700 Pacific Avenue
Suite 3300
Dallas, TX 75201

Jane Politz Brandt
Thompson & Knight LLP
1700 Pacific Avenue
Suite 3300
Dallas, TX 95201

17

Case No. C 04-4379 JF (RS)
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)

1  Michele Lee
   Wilson Sonsini Goodrich & Rosaty, a Professional Corporation
2  1700 K Sreet, NW
   Fifth Floor
3  Washington, DC 20006-3817

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 04-4379 JF (RS)
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
(JFLC1)